In re The **SOUTH CAROLINA PRESS ASSOCIATION**, Petitioner.

In re The **SOUTH CAROLINA PRESS ASSOCIATION; the State–Record Company, Inc.; the Evening Post Publishing Company; the Greenville News–Piedmont Company; the Spartanburg Herald–Journal, a Division of The New York Times Company, Incorporated; East Coast Newspapers, Incorporated, Petitioners.**

Nos. 91–5551, 91–5925.

United States Court of Appeals, Fourth Circuit.

Argued May 21, 1991.

Decided Oct. 4, 1991.

---

Jerry Ray Bender, Baker, Barwick, Ravenel & Bender, Columbia, S.C., argued for petitioner South Carolina Press Ass'n.

Edward Bart Daniel, U.S. Atty., Dean Eichelberger, Asst. U.S. Atty., Columbia, S.C., on brief, for respondent U.S.

James Hanjo Lengel, Holler, Olive, Merry, Lengel & Garner, Columbia, S.C., on brief, for respondent Paul Wayne Derrick.

Before WIDENER and NIEMEYER, Circuit Judges, and CHAPMAN, Senior Circuit Judge.

## OPINION

CHAPMAN, Senior Circuit Judge:

This matter is before the court for review of orders of the district court excluding the press and public from the *voir dire* of potential jurors in the criminal prosecutions of certain state legislators charged with selling their votes in the South Carolina General Assembly. This is a consolidation of petitions for writs of mandamus filed by the petitioners, the publishers of newspapers of general circulation within the State of South Carolina, who seek the writs to review the trial judge's decision to close *voir dire* of the jury venire to the press and the public.

### I.

Luther L. Taylor ("Taylor"), Larry Blanding ("Blanding"), Benjamin J. Gordon, Jr. ("Gordon"), and Paul Wayne Derrick ("Derrick") were members of the South Carolina General Assembly charged with extortion and extortion under color of official right for accepting money in exchange for their vote on matters pending before the General Assembly. These prosecutions, along with the indictment of approximately sixteen other legislators and lobbyists, have been termed "Operation Lost Trust" by the United States Attorney for the District of South Carolina. To date, there have been three trials:[1] (1) Luther Taylor; (2) Larry Blanding/Benjamin Gordon; and (3) Paul Wayne Derrick. In each case, the district court employed *in camera voir dire*.[2] Also in each case, a petition for writ of mandamus for review of the district court's closure of *voir dire* was filed by the South Carolina Press Association ("the

---

1. Since the argument of this appeal, the case of Tee Ferguson has been tried. The press and the public were not excluded for the *voir dire* of the jury venire in the Ferguson case because this defendant requested that the courtroom remain open.

2. In preparing each case for trial, potential jurors were asked to fill out an extensive and highly personal questionnaire to assist counsel in selecting a fair and impartial jury. The potential jurors were given the district court's assurance that their responses would be confidential and that only the defendant and the attorneys involved in the case, along with necessary court personnel, would be allowed to view their responses to the questionnaire. Since the *voir dire* of the jury venire would require responses to personal questions designed to examine the prospective jurors' possible racial prejudice, attitudes toward elected officials, concerns about "sting" operations, efforts to bribe members of the General Assembly, use of undercover agents, possible entrapment, and many other sensitive areas, the district court ordered that the *voir dire* of the jury venire be closed to the press and public.

Press Association"), a voluntary association of publishers of newspapers of general circulation in the State of South Carolina. The first petition was dismissed as moot. *See, In re The South Carolina Press Ass'n, et al.*, 917 F.2d 1302 (4th Cir.1990). This court consolidated the petitions from the second and third prosecutions and granted an expedited hearing.

Jury selection in the Blanding/Gordon case began on February 25, 1991, and the district court ordered *sua sponte* that *voir dire* would be conducted *in camera.* However, the attorneys for Blanding and Gordon moved for closure after the trial court had stated its desire to proceed *in camera.* No motion for *in camera voir dire* was docketed in advance of the announcement that the press would be excluded from *voir dire.* In a written order, the district court ruled that, in order to protect the defendants' rights under the Fifth and Sixth Amendments to the United States Constitution, members of the press would not be permitted in the courtroom during *voir dire.* The district court further ordered that the transcripts be sealed.

In the Derrick case, the district court issued a notice that a closure hearing would be held. Since the district court conducted the closure hearing on its own motion, no formal motion for the closure of *voir dire* was docketed prior to the hearing. The closure hearing was held on April 30, 1991. The government, counsel for the defendant, and the Press Association all participated in the hearing. While the Press Association opposed closure of *voir dire,* the government took no position on the issue, and counsel for the defendant supported closure. The district court found that "frank and forthright responses from potential jurors, which are essential to *voir dire,* would be chilled if they felt that their remarks would be published in the press and that requiring the juror to demand an *in camera* hearing does not alleviate the problem." Thus, the district court denied the Press Association's request that *voir dire* be open to the press and public. The Press Association petitioned for a writ of mandamus and, subse-

quently, an expedited hearing. This court granted petitioner's motion for an expedited hearing.

## II.

■ We must first consider whether we have jurisdiction under Article III, § 2 of the United States Constitution. Although jury selection in each of the cases has been completed and the cases themselves have now been tried, we find that the issues presented by these consolidated petitions are not moot. Jurisdiction exists because, as we have seen in this series of cases, the closure of jury selection to the press and public is "capable of repetition, yet evad[es] review" because of the short duration of criminal proceedings. *Press–Enterprise Co. v. Superior Court of California,* 478 U.S. 1, 6, 106 S.Ct. 2735, 2739, 92 L.Ed.2d 1 (1986) *("Press–Enterprise II").* This repetition is illustrated by the closed *voir dire* in the two cases which we now review as well as in the case of *United States v. Luther Langford Taylor, Jr.,* the previous Operation Lost Trust case in which the writ was denied because the jury selection process had already been completed.

## III.

■ Petitioners contend that the district court deprived them of procedural due process in ordering *in camera voir dire* prior to providing them an opportunity to be heard in opposition to closure. With regard to the Blanding/Gordon trial, we agree. However, with regard to the Derrick prosecution, we find that the district court gave the press and public ample notice and an opportunity to object to closure.

*In re Knight Publishing Co.,* 743 F.2d 231 (4th Cir.1984), establishes the procedural requirements to be followed by a district court before it may constitutionally close a courtroom to the public. The central requirement is that "representatives of the press and general public 'must be given an opportunity to be heard on the question of their exclusion.'" *Id.* at 234, *quoting Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 609 n. 25, 102 S.Ct. 2613, 2621

n. 25, 73 L.Ed.2d 248 (1982). In the Blanding/Gordon trial, the district court *sua sponte* ordered closure of *voir dire.* No motion for *in camera voir dire* was docketed in advance of the announcement that the press and public would be excluded. In fact, it was not until several prospective jurors had been examined *in camera* that the court undertook a discussion with counsel on the propriety of closing *voir dire.* No notice was given to petitioners that closure would be reconsidered, and the court concluded its discussion by ruling that closed *voir dire* would continue. At that point, the court issued its written order stating that the responses given by the prospective jurors already examined would have been chilled to the detriment of the defendants' Sixth Amendment rights had *voir dire* not been closed. As *In re Knight* clearly holds, the press and the public are entitled to "notice and an opportunity to object" to closure of *voir dire. Id.* In the Blanding/Gordon case, ample notice was not provided. Members of the press and public were given no notice of the court's intention to close *voir dire* and were afforded no opportunity to object to closure. We therefore find that in the Blanding/Gordon case, the district court erred in failing to give advance notice to petitioners that it would consider closing the *voir dire* and in failing to provide petitioners an opportunity to be heard in opposition prior to ordering the closure.[3]

■ In the Derrick prosecution, the district court, approximately two weeks prior to the closure hearing, issued a notice that a hearing would be held. Since the district court held the closure hearing on its own motion, no formal motion for the closure of *voir dire* was docketed prior to the hearing. Nevertheless, counsel for the government, the defendant, and the Press Associ-

ation all participated in the hearing. *In re Knight* requires only that the press and public be given notice and opportunity to object to closure. Given the district court's issuance of a hearing notice and the fact that petitioner did indeed participate in the closure hearing, we find that, in the Derrick prosecution, the district court complied with *In re Knight's* mandate.

IV.

■ We now consider whether the district court erred in closing *voir dire* to the press and public.[4] After considering the findings of fact by the district court of this case, the applicable law, and hearing oral argument, we hold that the district court correctly interpreted the law as set forth in *Press–Enterprise II* and that its findings of fact as to the substantial probability of prejudice to the accused's right to a fair trial are not clearly erroneous.

In *Press–Enterprise Co. v. Superior Court of California,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*"Press–Enterprise I"*), the Supreme Court addressed closure of *voir dire* to the press and public. *Press–Enterprise I* holds that court proceedings are presumptively open to the public and that this presumption of openness may be overcome "only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* at 510, 104 S.Ct. at 824. In *Press–Enterprise II,* the Court expanded on this holding as follows:

> If the interest asserted [in support of closure] is the right of the accused to a fair trial, the preliminary hearing shall be closed only if specific findings are made demonstrating that, first, there is a substantial probability that the defen-

---

**3.** Notice in the present cases is complicated by the district court's use of the extensive questionnaire mailed to potential jurors with the court's assurance of confidentiality of responses. It will only be the unusual case in which this type of questionnaire is used, and its use will be in anticipation of closure of the voir dire of the venire. However, when the court and the attorneys prepare such a questionnaire and promise confidentiality of responses thereto, they must

consider the notice requirements of *In re Knight.*

**4.** Petitioners argue that citizens have no right of privacy when they have been drawn for jury service. It is not necessary for us to decide this issue, although we question its validity, because here we are concerned with the right of an accused to a fair trial before an impartial jury.

dant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights.

*Press–Enterprise II,* 478 U.S. at 14, 106 S.Ct. at 2743.

We have established a three-prong test for trial courts to use in deciding if pretrial proceedings may be closed to the press and/or the public in order to protect a defendant's right to a fair trial. Such proceedings may be closed only if the district judge

makes specific judicial findings that (1) there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity; (2) there is a substantial probability that closure would prevent that prejudice; and (3) reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights.

*In re State Record Co., Inc.,* 917 F.2d 124, 128 (4th Cir.1990), quoting from *In re Charlotte Observer,* 882 F.2d 850, 853 (4th Cir.1989).

The district judge in his orders in the Blanding/Gordon case and the Derrick case made specific findings as required by *In re State Record* and *In re Charlotte Observer.* After a careful review of the record, we conclude that these findings are not clearly erroneous.

As we stated in *In re Greensboro News Co.,* 727 F.2d 1320, 1325 (4th Cir.1984): "A careful and exhaustive *voir dire* is crucial to ensure that these defendants will be tried by an impartial jury which will render its verdict on the basis of evidence adduced at trial rather than information from the newspapers or television." In *Greensboro News,* we also concluded that a trial judge's *in camera voir dire* of potential jurors in a criminal prosecution so as to ensure frank and forthcoming responses was not an unusual practice, "nor viewed with suspicion." *Id.* at 1323.

The present prosecutions arise out of Operation Lost Trust and involve many highly charged and emotional issues. In addition to the charges of vote buying and bribery, there are charges of illicit drugs. These prosecutions arise out of a "sting operation," and there are film and video tape recordings of many of the illegal acts. Certain defendants claim that they are being persecuted, in addition to being prosecuted, because of their race, and that a disproportionately large number of black legislators have been targeted for prosecution.

The trial court, the attorneys for the defendants, and the United States Attorney realized that many problems would arise in selecting an impartial jury to decide these difficult cases and that every effort should be made to obtain as much information as possible about the venire persons including information about their attitudes, opinions and possible prejudices on various topics and issues considered pertinent to the trials. In an effort to obtain this information and assist the attorneys in selecting an impartial jury, the court, with input from the attorneys, prepared an 18 page questionnaire containing 66 sections. This questionnaire was mailed to the venire well in advance of the trial with the request that it be returned to the Clerk of Court approximately two weeks prior to trial. When the questionnaires were returned, copies were delivered to defense counsel and to the United States Attorney.

When the questionnaire was mailed to the venire, it contained a statement:

The information you provide in this questionnaire will be provided to the court and the attorneys for both sides in this case. It is confidential; and when the case is concluded, the questionnaire will be destroyed. The answers you provide must be truthful and complete to the best of your ability; and if you knowingly give a false answer, you may be subject to the penalties for perjury.

The completed questionnaires were used extensively by the attorneys in conducting the *voir dire* of the venire persons.

In considering the three-prong test of *In re State Record Co.* and *In re Charlotte Observer,* the trial court found:

This court is aware that the concerns over press reports reaching the venire

are not applicable here in as much as the venire is sequestered. Nevertheless, we find that frank and forthright responses from potential jurors, which are essential to *voir dire*, would be chilled if they felt their remarks would be published in the press. For example, in the *Taylor* case, questions were posed to the potential jurors which concerned any possible biases against blacks as well as probing questions involving the criminal records of family members. These questions elicited very personal and emotional responses from potential jurors. Even without the press at the hearing, the potential jurors were sometimes reluctant to speak frankly before the court and it was only after the repeated assertions of the court that the proceedings were private that these jurors began to respond. After viewing the statements of these potential jurors, there is no doubt in the mind of the court that their responses would not have been as candid had they believed that the press would report the contents of the proceedings. Although we have only questioned nine potential jurors, similar questions have already been asked. If the *voir dire* is to serve its function as the safeguard of the defendant's sixth amendment rights, then clearly candor must be the hallmark of such a proceeding. Therefore, this court feels that the presence of the press and others creates a substantial probability that the candor of the venire would be impaired and would impinge on the sixth amendment rights of the defendant.

Second, as stated above, this court is convinced that the closure of the *voir dire* is effective in eliciting frank and candid responses from the potential jurors. As a result, the *voir dire* serves his purpose in ensuring the defendants of a fair and impartial jury.

As to the third prong of the test, counsel for the press offers two alternatives to an *in camera voir dire*, which were to handle sensitive matters in side bar conferences or assign the prospective jurors numbers to address privacy concerns. These solutions do not seem to address the problem. The confidential questionnaires which the potential jurors submitted must still be alluded to in such a proceeding and the juror is still faced with answering very personal and private questions before a gallery full of press. It would be difficult, if not impossible, for this court to anticipate what questions the potential juror might feel justifies a side bar. Thus, the juror would have to request the side bar after the question has already been posed, which arguably chills the witness' response. Alternatively, even if the juror is assigned a number, they are aware of the presence of the press in the courtroom.

As examples, two of the potential jurors have been asked questions about either their criminal records or the criminal records of various family members and a third specifically asked several times during his questioning whether his responses were confidential. Clearly, these jurors were concerned about personal and private information being released to persons other than those whose presence was required in the courtroom. Using a side bar in these situations would only have attracted more attention to a situation with which these veniremen clearly did not feel comfortable discussing. Further, assigning a number to a juror instead of referring to them by name would not appear to lessen the juror's concern over confidentiality.

Nor could this court determine an alternative at the time which would ensure complete candor, yet allow the press to report on the questions and the answers put before the potential jurors. In the future, alternatives to a closed *voir dire* may present themselves. However, in this case, the potential jurors were assured by this court that their comments were between them, the court and the attorneys and nobody else. This court believes that the potential jurors thus far have answered in the manner that they did because they had the court's assurance that the proceedings were confidential. Thus, there was a substantial probability that alternatives to closing the procedures would not insure candid re-

sponses on the part of the potential jurors and would not protect the right of the defendant to a fair trial.

The right of the press to access to criminal proceeding is presumed, but it is qualified because it must yield to a defendant's Sixth Amendment right to a fair trial when there is a finding that the right of the accused to a fair trial will be undermined by the publicity resulting from press coverage.

> In such cases, the trial court must determine whether the situation is such that the rights of the accused override the qualified First Amendment right of access. In *Press–Enterprise I*, we stated:
>
> > [T]he presumption may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Press–Enterprise II*, 478 U.S. at 9–10, 106 S.Ct. at 2740–41 (citations omitted).

The selection of a fair and impartial jury is a right protected by the Sixth Amendment and is one of the "high values" mentioned above. Full and frank answers from potential jurors, when they are questioned on *voir dire* are essential to the process of selecting such a jury. Pretrial publicity can prevent an accused from receiving a fair trial, *see Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Furthermore, fear of publicity that might be given to answers of venirepersons during *voir dire* may so inhibit or chill truthful responses that an accused is denied the fair trial to which he is entitled under the Fourteenth Amendment.

The trial judge in the present case made the necessary findings to support his closure in his written order, but in addition to the facts set forth in the written order, he made oral findings from the bench after hearing arguments from the petitioners. In the *Derrick* case, the trial judge stated:

> I am confident, and I don't have to go any further back than these cases that have been referred to here today, the *Taylor* and the *Blanding* case, that if a juror is in that room, and if he has been assured that the answer he gives to the questions propounded by the court or the attorneys or that he had put in that questionnaire are not going to leave the confines of that room, they literally open up their heart and brain to them to try and do what is right because most jurors want to do what is right. I have become convinced of that. I have had them come in here and sit down and right off the bat say, "I will tell you right now, Your Honor, there is no way I can give that defendant a fair trial. He is guilty as far as I am concerned, and there is no way I am going to change that if I am on the jury room and find him not guilty."
>
> The next question is, "Why?".
>
> "Because I have to go back to work Monday and face these fellow workers and they think this or that and I just can't do it, so you are going to have to excuse me from this jury."
>
> I have never had a juror stand up in open court and say, "Oh, no, sir, I can't give him a fair trial because I have to go back to work Monday and discuss this with my working people." It is a different situation.
>
> Numerous other things. I have had mothers appear in this same courthouse on the jury panel say, "I really don't know what I can do. My son is being charged with either manslaughter or murder and my husband says I shouldn't even be here but I think it is my duty to be here." She wouldn't do that in this open court. I had mothers tell about children who are drug—I don't want to use the term "addicts." I had children tell about parents and brothers and sisters. They are not going to expose their whole lives and the family's lives because they know for sure what the press will do with their lives when they bare it out because it is news and it makes stories. I don't blame the press for printing it but it wrecks a lot of people's lives and families along the way.

For that reason, I have always for a long time, ten or eleven years at least, figured that the truth is what we are trying to find. If we have to go into a closed room to find it, then we find it there. At least I can rest at ease and the attorneys can rest at ease that the people sitting in that jury box have come with an open mind and open heart, and the defendant is going to get a fair trial and the government is going to get a fair trial.

The trial judge had recently tried the Taylor case, which was the first trial resulting from "Operation Lost Trust," and he had experienced the reaction of the potential jurors to *voir dire* and their desire for confidentiality of their responses. The court also had the support of the defendants and their attorneys, who agreed that confidentiality was essential to selecting an impartial jury.

Closure of *voir dire* is an effective means by which to protect the defendants against the perceived threat to a fair trial in these cases. As we found in *In re Greensboro News Co.*:

Finally, there is no argument that the closure order will fail to protect against the perceived harms. The elimination of publicity concerning the individual *voir dire* will assure that potential jurors will be insulated from the questions and other jurors' answers for as long as possible. Furthermore, the potential jurors will be more candid in their responses if they do not have to worry about what the public's opinion of those responses might be.

727 F.2d at 1326.

We agree with the district court that under the very unusual circumstances of these cases, no reasonable alternatives to closure will adequately protect the fair trial rights of the accused.

We find that the petitioners are not entitled to a writ of mandamus. While the district court did not give the required notice to petitioners in the Blanding/Gordon case, this condition was met in Derrick, and

the issuance of the writ for this oversight would at this date serve no useful purpose.

PETITION DENIED.