369 S.C. 69 (2006)
631 S.E.2d 86
Ex parte HEARST-ARGYLE TELEVISION, INC., d/b/a WYFF TV-4, and The Greenville News, a division of the Gannett Pacific Corporation, Intervenors-Appellants,
In re The State,
v.
Charles Christopher Williams, Both of Whom are, Respondents.
No. 26159.
Supreme Court of South Carolina.
Heard May 3, 2006.
Decided May 30, 2006.
Carl F. Muller and Wallace K. Lightsey, both of Wyche Burgess Freeman & Parham, of Greenville, and Rivers S. Stilwell, of Nelson Mullins Riley & Scarborough, of Greenville, for Appellants.
Assistant Appellate Defender Robert M. Dudek, of Columbia, and Solicitor Robert M. Ariail, Deputy Solicitor Betty C. Strom, and Assistant Solicitor Andrew Burke Moorman, all of Greenville, for Respondents.
*71 Chief Justice TOAL.
Hearst-Argyle Television and The Greenville News (collectively "Appellants") appeal the trial court's decision closing the courtroom during a pre-trial suppression hearing in a capital murder case. We reverse.

FACTUAL/PROCEDURAL BACKGROUND
This case arises out of Charles Christopher Williams' (Defendant's) trial for the murder of his former girlfriend (Victim). In July of 2003, Defendant assaulted Victim as she left her job at a Greenville grocery store. Police arrested Defendant *72 and charged him with assault and battery with intent to kill (ABIK). While out of jail and awaiting trial on the ABIK, Defendant entered Victim's workplace with a shotgun and held her hostage for several hours. The incident ended when police stormed the grocery store and found Victim dead. Police arrested Defendant at the crime scene, and an autopsy revealed that Victim had been shot four times with a shotgun.
Prior to trial, issues arose regarding statements Defendant made to police. Specifically, Defendant gave police a lengthy confession immediately after his arrest and a forensic psychiatrist interviewed Defendant for several hours immediately thereafter. Defendant's testimony to the psychiatrist yielded incriminating information and also led police to discover a journal Defendant kept which contained additional incriminating evidence. One week prior to selecting the jury for Defendant's trial, Defendant moved to suppress the journal and the statements he made to the psychiatrist.
Immediately, this case received a great deal of media attention. Several television stations broadcast live from the grocery store during the hostage standoff, and Appellant Greenville News published at least thirty-eight news and opinion articles either exclusively devoted to this case or addressing the case in the broader context of "the domestic violence problem in South Carolina."
The trial court held most of the pre-trial proceedings in Anderson in hopes that the media would not attend. Prior to the hearing on Defendant's motion to suppress, this strategy was successful. In fact, until the suppression hearing, the media did not attend any of the pre-trial proceedings. Appellants sent reporters to the suppression hearing however, and after these reporters identified themselves to the trial court, the court announced its intention to close the courtroom.[1]
Appellants requested a hearing to allow their attorneys to present arguments opposing closing the courtroom. While Appellants phoned their attorneys, the court asked the parties if limiting the hearing to legal arguments regarding suppression might allow Appellants to remain present. Defendant *73 voiced strong opposition to the presence of the media, expressing concern about not being able to prevent witnesses from discussing substantive facts in their answers.
After Appellants' attorneys arrived, the court conducted a hearing on closing the courtroom. Relying on precedent of this Court and the United States Supreme Court, the trial court held that a courtroom may be closed only upon specific findings showing "a substantial probability of prejudice from publicity that closure would prevent and [that] there's no reasonable alternatives." Relying on the fact that this case involved the "hot button" issue of domestic violence, an issue which had played prominently in the media's coverage of the case, and because this case also involved sensitive racial issues, the court closed the suppression hearing.
Though not relevant to the merits of this appeal, the trial court denied Defendant's motion to suppress. The trial proceeded, and a jury convicted Defendant and sentenced him to death. This appeal followed,[2] and Appellants raise the following issues for review:
I. Did the trial court close the courtroom without sufficient justification?
II. Did the trial court violate Appellants' procedural due process rights in closing the courtroom?

LAW/ANALYSIS
Although both the suppression hearing and the criminal trial in this case have concluded, we review the case despite its mootness because, as courts have generally held in these cases, closing the courtroom is a wrong "capable of repetition yet evading review." See In re S.C. Press Ass'n, 946 F.2d 1037, 1039 (4th Cir.1991); and Ex parte Columbia Newspapers, Inc., 286 S.C. 116, 118, 333 S.E.2d 337, 338 (1985) (citing Gannett DePasquale, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1983) and Steinle v. Lollis, 279 S.C. 375, 307 S.E.2d 230 (1983)).

*74 I. Justification for Closure
Appellants argue the trial court closed the suppression hearing without sufficient justification. We agree.
The rights of the public and the press to attend criminal trials are guaranteed by the South Carolina Constitution and the United States Constitution. Because the majority of "closed courtroom" cases focus largely on the federal constitutional analysis and jurisprudence, we begin there.
United Stated Supreme Court has interpreted the guarantees of free speech and freedom of the press found in the First Amendment to the United States Constitution to include a constitutional guarantee of open and public courts. Richmond Newpapers, Inc. v. Virginia, 448 U.S. 555, 580, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). Because the court views the rights of the public and press as constitutionally guaranteed, the First Amendment analysis applies a strong presumption favoring open criminal proceedings. In re Charlotte Observer, 882 F.2d 850, 852 (4th Cir.1989); In re Knight Publishing Co., 743 F.2d 231, 234 (4th Cir.1984). This presumption may only be overcome by an overriding interest based on specific findings that closure is necessary to preserve "higher values," and the closure must be narrowly tailored to serve that interest. In re Charlotte Observer, 882 F.2d at 852-53 (citing Press-Enterprise Co. v. Superior Court of California, 478 U.S. 1, 13-14, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (Press Enterprise II)); In re Knight Publishing Co., 743 F.2d at 234 (citing Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (Press Enterprise I)).
When the alleged "higher value" justifying closure is protecting the defendant's Sixth Amendment right to trial by an impartial jury, the courtroom may be closed only if specific findings are made that (1) there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity, (2) there is a substantial probability that closure would prevent that prejudice, and (3) reasonable alternatives to closure could not adequately protect the defendant's rights. In re S.C. Press Ass'n, 946 F.2d at 1041; In re Charlotte Observer, 882 F.2d at 853. Additionally, the trial court must list specific findings justifying closure so an appellate court may review the decision and determine its correctness. In re *75 Knight Publishing Co., 743 F.2d at 234. Courts have generally interpreted this requirement as establishing a de novo standard of review. In re Charlotte Observer, 882 F.2d at 853 (citing In re Washington Post, 807 F.2d 383, 381 (4th Cir. 1986)).
Although South Carolina, like the federal courts, has a rich jurisprudential history in the area of courtroom closure, the origins of the state and federal guarantees of open courtrooms are quite different. Our Constitution parallels the United States Constitution in numerous ways. For example, article I, § 2 of the South Carolina Constitution is strikingly similar to the First Amendment to the United States Constitution. Also, article I, § 14 of the South Carolina Constitution provides the equivalent of the Sixth Amendment's guarantee of a speedy and public trial to a criminal defendant. Arguably, the difficulty the federal courts experienced in the early stages of closed courtroom jurisprudence involved finding a constitutional basis for the guarantee of open courtrooms.[3] As we have explained, the federal courts eventually interpreted the First Amendment in such a manner as to provide this guarantee, and the federal law in this area has largely become well-settled.
In South Carolina, however, our Constitution contains a particular provision that has no parallel at the federal level. Specifically, our Constitution provides "[a]ll courts shall be public, and every person shall have speedy remedy therein for wrongs sustained." S.C. Const. art. I, § 9.[4] While federal *76 case law was still in considerable flux, our jurisprudence recognized article I, § 9's independent constitutional guarantee of open courts and held "[e]xclusion of the press and public from judicial proceedings is a drastic measure calling for a careful weighing of interests affected." Steinle v. Lollis, 279 S.C. 375, 376-77, 307 S.E.2d 230, 231 (1983). As both federal and state law evolved, we clarified that a judge's decision to close any proceeding must be supported by specific findings explaining the balancing of the interests at stake and the need for closure. Ex parte Island Packet, 308 S.C. 198, 201, 417 S.E.2d 575, 577 (1992) (explicitly adopting Press Enterprise II's test); Ex parte Columbia Newspapers, 286 S.C. at 118-19, 333 S.E.2d at 338 (relying on Steinle and article I, § 9 of the South Carolina Constitution, as well as Gannett).
Although the state and federal constitutional origins of these rights are substantially different, we now hold that the test for reviewing the propriety of closing a courtroom under the South Carolina Constitution is identical to the First Amendment analysis of the issue. This holding is grounded in the fact that this Court's earliest precedent closely mirrors the current First Amendment analysis of this issue, and in the fact that this Court has continually relied on both state and federal precedent in analyzing these cases.[5]
In the instant case, the trial court relied on concerns about racial issues and the "hot button" issue of domestic violence in closing the pre-trial suppression hearing. Though these concerns *77 were no doubt genuine, closing the courtroom could not possibly have alleviated either of them. As the record demonstrates, closing the courtroom had no effect on Appellants' abilities to publish or disseminate news about Defendant's case. Though the trial court had the ability to prevent the press from attending the suppression hearing, the court did not have the ability to prevent the press from speaking on the subject matter. Indeed, preventing the press from attending the suppression hearing had no impact on the press' ability to further publicize Defendant's race, crime, or any issue related to his case. Thus, assuming there was a substantial probability that pre-trial publicity would prejudice Defendant, closing the courtroom could not have prevented that prejudice.
Additionally, it is helpful to discuss another of the trial court's concerns involving the media's presence at the suppression hearing, though it was not specifically articulated in the court's justifications for its decision. In this case, the trial court was concerned that details of Defendant's confession to the psychiatrist might be revealed in the hearing and subsequently published by the media. Similar, however, to the justifications offered above, this concern would also fail to support closure. We believe the trial court's original suggestion to limit the hearing to legal arguments addressing suppression would be sufficient to alleviate this fear. Additionally, we take this opportunity to reiterate that jury voir dire is the preferred and generally accepted tool that protects a defendant from the prejudicial effects of pre-trial publicity. In re Charlotte Observer, 882 F.2d at 855.
Because closing the courtroom had no effect on preventing additional publicity regarding Defendant's case, the case as it related to the issue of domestic violence in South Carolina, or any racial issues involved in the trial, we reverse the trial court's decision closing the pre-trial suppression hearing.[6]

*78 II. Procedural Due Process
Appellants allege the trial court closed the courtroom in violation of their procedural due process rights. Specifically, Appellants allege the trial court closed the hearing sua sponte and without giving Appellants adequate notice and a meaningful opportunity to be heard. We disagree.
First, we note that the trial court, in this case, did not close the courtroom on its own motion. Although the court stated its intention to close the hearing on its own motion if Defendant did not make a motion first, the record clearly indicates that Defendant made an oral motion to close the courtroom. Therefore, the argument that the court closed the courtroom sua sponte is without support in the record.
If, however, the trial court had closed the courtroom sua sponte, the distinction would not be significant. In In re S.C. Press Ass'n, the fourth circuit upheld the trial court's decision closing voir dire after the trial court sua sponte issued a notice that it would hold a closure hearing. 946 F.2d at 1039. Because the court raised the issue on its own motion, no formal notice was docketed prior to the hearing. Id. The fourth circuit upheld the trial court's decision, and in doing so, the court held that this process gave the press and public adequate notice and opportunity to voice opposition to the court's decision. Id.
Appellants' argument, "that a court cannot, in some circumstances, raise matters on its own motion," overstates the case and ignores the critical balance at work in closed courtroom cases. Although the public and the press have constitutionally guaranteed rights in the courtroom, those rights are not absolute and will sometimes compete with and obstruct a criminal defendant's constitutionally secured right to receive a fair trial. In criminal cases, the trial court has a duty to protect a defendant's constitutional right to a fair trial. Sheppard v. Maxwell, 384 U.S. 333, 362-63, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). We decline to take such a view of these cases as to, with one hand, charge the trial court with the duty of protecting both the defendant's and the public's constitutional *79 rights, and with the other hand, hamstring the court by requiring it to refrain from considering these issues until asked to do so. If closing the courtroom is the only available option to prevent the substantial probability that publicity would prejudice the defendant's right to a fair trial, the trial court may raise the issue on its own motion, conduct the required hearing, and issue a ruling.
Regarding notice and an opportunity to be heard, in this case, the trial court identified Appellants' presence in the courtroom, announced his intention to close the courtroom, and asked Appellants if they had any comment. Appellants requested a hearing during which they could argue against closing the courtroom, and the trial court held a hearing on closure where both Appellants were represented by legal counsel.
In closed courtroom cases, individual notice is not required. In re Knight Publishing Co., 743 F.2d at 235. Generally, notifying the persons present in the courtroom "reasonably in advance of deciding the issue" is appropriate. Id.[7] Here, the trial court alerted Appellants' representatives of its intentions, and the court allowed Appellants' attorneys a meaningful opportunity to be heard on the issue. Appellants provided the trial court with the relevant authority on the issue, and each presented skillful arguments. In our view, it would indeed take a skewed view of the record to conclude that the trial court's decision making process in this case violated Appellants' procedural due process rights.

CONCLUSION
Although we are satisfied that the trial court in this case paid careful consideration to Appellants' due process rights and applied the proper legal standard, we hold that the reasons offered in support of closing the courtroom were insufficient to justify infringing upon the state and federal constitutional guarantees of open courts. We believe the trial court's justifications are accurately re-characterized as concerns *80 regarding additional pre-trial publicity and its possible effect on being able to draw an impartial jury. Because closing the suppression hearing had no effect on preventing additional publicity of the trial, we reverse.
MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.
NOTES
[1] The court initially stated that if Defendant did not move to close the proceeding, the court would do so sua sponte. Later, Defendant made an oral motion to close the proceeding.
[2] Although this appeal does not involve the merits of Defendant's conviction or sentence, the appeal came directly to this Court because Defendant's trial resulted in a death sentence. See Rule 203(d)(1)(A), SCACR (stating that an appeal in a death penalty case is heard in this Court). Defendant's direct appeal to this Court is currently pending.
[3] Compare Gannett v. DePasquale, 443 U.S. 368, 391-92, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1978) (holding that the members of the public have no constitutional rights under the Sixth and Fourteenth Amendments to attend criminal trials, and assuming arguendo that the First Amendment guarantees the public a right to attend pre-trial criminal proceedings, the trial court heard arguments in objection to the closure and adequately "balanced the `constitutional rights of the press and public' against the `defendants' right to a fair trial.'"), with Richmond Newpapers, Inc. v. Virginia, 448 U.S. 555, 580, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (stating "that the right to attend criminal trials is implicit in the guarantees of the First Amendment; without the freedom to attend such trials ... important aspects of freedom of speech and `of the press could be eviscerated.'").
[4] In State v. Lagerquist, 254 S.C. 501, 506, 176 S.E.2d 141, 143 (1970), we declined to interpret the latter portion of this provision as guaranteeing a right to a speedy appeal in a criminal case. Additionally, we clarified that the latter portion applies only to civil proceedings. Id. (stating that construing the provision to apply to criminal trials would render article I, § 14's guarantees superfluous). These interpretations are not relevant to this case, however, because they have no bearing on the unqualified language at the beginning of the section.
[5] Arguably, our analysis begins by determining whether the particular type of proceeding has historically been open and whether public scrutiny plays a significant role in the functioning of the proceeding. Ex parte Island Packet, 308 S.C. at 201, 417 S.E.2d at 577 (citing Press Enterprise II). This inquiry is unnecessary in this case because this Court has recognized the public's right of access to pre-trial suppression hearings. See In re Greenville News, 332 S.C. 394, 396, 505 S.E.2d 340, 341 (1998) (citing Waller v. Georgia, 467 U.S. 39, 47, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984)). Again, this proposition is strengthened by the South Carolina Constitution's unqualified language guaranteeing open courtrooms.
[6] Although we reverse the trial court's ultimate decision, we are satisfied that the trial court applied the proper legal standard in considering this issue. Though the court initially referred to the case of Gannett v. DePasquale and to Rule 605(f)(iii), SCACR (governing media coverage of court proceedings), as the relevant authority in this area, the court's articulation of the test, that there be "a substantial probability of prejudice from publicity that closure would prevent and [that] there's no reasonable alternatives," is a proper restatement of the constitutional analysis mandated by the Island Packet and Press Enterprise II decisions.
[7] Appellants rely on In re Knight Publishing Co., and argue that the trial court had already made his decision before he held the hearing. The record does not support this argument; particularly in light of the trial court's statements before and during the hearing.