**IN THE COURT OF APPEALS OF IOWA**

No. 14-0066
Filed May 20, 2015

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**BRANDON DANDRE BROWN,**
        Defendant-Appellant.

_____

        Appeal from the Iowa District Court for Johnson County, Marsha A. Bergan, Judge.


        A criminal defendant appeals from his conviction for first-degree murder.

**AFFIRMED.**


        Mark C. Smith, State Appellate Defender, and Bradley M. Bender, Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, Sheryl A. Soich, Assistant Attorney General, Janet M. Lyness, County Attorney, and Dana Christiansen and Jude Pannell, Assistant County Attorneys, for appellee.


        Heard by Vogel, P.J., and Potterfield and Mullins, JJ.

**MULLINS, J.**

Brandon Dandre Brown appeals from his conviction for murder in the first degree. He contends the district court abused its discretion in denying his motion for mistrial when journalists in the courtroom published the personal information of a prospective juror, allegedly impairing his right to an impartial jury and consequently a fair trial. He further contends the evidence was insufficient to support the conviction for first-degree murder because it did not support a finding that he was the shooter. Finally, he contends the district court erred in denying his motion for new trial where the jury verdict was against the weight of the evidence.

We find Brown fails to make the necessary showing that the impanelled jury was biased and that therefore his right to a fair trial was impaired. We further find that the weight of the evidence rests heavily in support of the verdict. Because we so conclude, we find the lower burden of sufficient evidence is met. Therefore, we affirm the denial of the motion for mistrial, the denial of the motion for new trial, and the verdict and judgment of guilty.

## I. BACKGROUND FACTS AND PROCEEDINGS.

On June 21, 2012, DiMarco Harris spent the day drinking with Donelle Lindsey at Harris's apartment on Petsel Road in Iowa City. Harris testified he had just been released from prison and was on parole. They met between 11:00 a.m. and 12:00 p.m. and drank until around 7:00 pm. On two occasions, Lindsey left the apartment to talk on his telephone. At around 7:00 p.m., Lindsey told Harris he was going to leave to "meet [his] ride" and would call later. Thirty

minutes later, Lindsey returned, eager to spend more time with Harris. Sometime around 9:00 or 10:00 p.m., Lindsey arranged for a friend to come pick him up. Harris testified that although they had been drinking, they were not inebriated.

Harris testifed he and Lindsey were waiting outside and talking. Brandon Brown and Byron Fisher approached them. Harris knew Fisher was his downstairs neighbor but did not know Brown. Fisher greeted Harris and shook his hand. Brown addressed Lindsey by a nickname and asked to talk to him. Brown and Lindsey walked off together toward the side of the apartment building. Harris continued talking with Fisher. At one point, Fisher said to Brown and Lindsey, "You all better cut that shit out." Harris then saw Brown reveal a gun and shoot Lindsey. He thought there were four shots. Brown ran off toward the back of the building and to the north. Lindsey walked back to where Fisher and Harris were standing. Harris could not tell how badly Lindsey was injured but could see he was bleeding. Fisher left and went back into the apartment building. Harris ran after Fisher asking, "Who was that dude?" Fisher was crying and unable to speak. Harris went into his apartment and stayed there. His girlfriend had already called 911. He did not return to the scene when police officers arrived because he had just been released from jail, he was on parole, and had been drinking.

Fisher testified that he was at his apartment when Brown came over at about 6:00 or 7:00 p.m. that evening. He had known Brown for seven or eight months. Fisher and Brown drank together for a couple of hours. While walking

to Fisher's apartment building, they observed Lindsey and several other people hanging out outside. Fisher testified he and Brown decided to walk to a nearby gas station, but Brown stopped to speak with Lindsey. The conversation was hostile on both sides with Brown stating something like, "[Lindsey] can't fight or [Brown] will whup his ass." Fisher testified Brown walked away in anger, then returned a few minutes later with a gun in his hand, held low by his side. He pulled Lindsey away from the main gathering, and said something like, "What was that shit you was just talking." Lindsey did not respond. Fisher testified Brown then pointed the gun at Lindsey from a couple feet away and shot him four times in rapid succession. Lindsey took a few steps, then fell and did not move. Fisher went into his apartment and remained there. He testified he did not contact police when they arrived on the scene because he did not want anything to do with the incident. Both Harris and Fisher lied when initially interviewed by law enforcement officers, but later told what happened and testified at trial. Upon seeing a line-up of suspects in the shooting, Harris initially narrowed the options down to two men.

Nicole Blosser was living with her boyfriend, Ivan Hardemon, in a nearby apartment complex. Hardemon was Brown's cousin.[1] She and Hardemon were standing outside her apartment on the evening of June 21 when they heard gunshots. They ran into the apartment. Hardemon got a telephone call on his cell phone, went downstairs, then came back up with Brown. Hardemon and Brown went into a back room and talked for a few minutes. They then came out,

---

[1] Hardemon did not testify at trial. He died shortly after these events.

and Hardemon told Blosser they all had to go. Blosser, Hardemon, and Brown took her car and drove to Chicago.[2] Brown stated he had shot a man. They dropped Brown off at an apartment building in Chicago, turned around and drove straight back to Iowa City. In the car on the way back, Hardemon instructed Blosser not to discuss the event with anyone. Once back in Iowa City, Hardemon got a phone call from Brown's girlfriend, who lived a few buildings over. Hardemon and Blosser drove over to the girlfriend's apartment. The girlfriend gave them a shoe box containing two handguns. They then drove to the home of Brett and Kathy Kriz and handed Brett the box. Brett and Hardemon went into a back room for a few minutes and returned. Later, law enforcement officers interviewed Blosser at her apartment. At first she did not cooperate, because she was scared and did not want to be involved, but later gave full answers. At the time of the incident, Hardemon was present in Iowa in violation of his parole and, as a felon, could not possess firearms.

Brett Kriz was subpoenaed to testify but refused to answer most questions, citing his Fifth Amendment right against self-incrimination. Law enforcement officers executed a search of his home but found nothing relevant to the shooting. The medical examiner testified Lindsey suffered five gunshot wounds. At least one bullet went through Lindsey's heart and death would have followed shortly afterward as a result. Two of the wounds would have been fatal individually.

---

[2] Blosser drove because Hardemon did not have a driver's license.

Based on Harris's and Fisher's identification, the State charged Brown with murder in the first degree, in violation of Iowa Code sections 707.1 and 707.2(1) (2011). On November 12, 2014, the parties commenced the trial with a relatively heavy media presence. Reporters were present in the courtroom from the Cedar Rapids Gazette, the Iowa City Press Citizen, and the University of Iowa Daily Iowan. Prior to commencement of proceedings, the court held a discussion with these media sources and clarified the new expanded media coverage rules in the Iowa Court Rules, which went into effect on May 1, 2014. The court informed the reporters that the jury selection process was excluded from the expanded media rules, and therefore there should be no broadcasting or publication of the personal details of the prospective jurors.

Jury selection proceedings took place over two days and were open to the press and public. During proceedings, the court discovered that a reporter for the Cedar Rapids Gazette had live-blogged the name and some personal information of a prospective juror. The information included the name of the juror's business in downtown Iowa City, his position on a sensitive local government board, and comments he made about his wife and her safety in the neighborhood of the shooting. The court spoke with the reporter on the record, who agreed to remove the information from the live-blog immediately. The reporter removed the blog so quickly, a few minutes later he was unable to recite the text when the court wished to place it on the record.[3] The other reporters in the room did not blog personal information of the jurors. All the reporters agreed

---

[3] A portion of the text was recited into the record as it had been written down by an attorney before the blog deleted the post.

not to live-blog the remainder of the jury selection proceedings. Brown moved for mistrial, and the court reserved its ruling.

The court then brought the affected juror before the parties and informed him of what had happened. He expressed disappointment at the publication of his information. He reported experiencing repercussions when his business has been connected to his work on the local government board. The court instructed the juror to turn on his phone to see if anyone had contacted him regarding the published information, but he did not receive any such contact.

Brown then moved to strike the juror for cause. The State did not resist, and the court dismissed the juror. Afterward, the court brought forward the remaining prospective jurors, informed them what had happened, and asked if they had any concerns or received any communications regarding the publication of the removed juror's information. No member of the jury pool had been contacted. The court informed the jurors the reporters agreed not to live-blog the remainder of the jury selection and guaranteed the court would ensure no such information was blogged. The court denied the motion for mistrial, concluding the parties could impanel an impartial jury. After releasing the jury for the evening, the court checked again the following morning to see if anyone had been contacted as a result of the blogging; no juror reported being contacted. The jury selection continued, the trial commenced, and the jury returned a verdict of guilty.

On appeal, Brown contends the district court abused its discretion in denying his motion for mistrial asserting the publication of the prospective juror's

name and person information impaired Brown's right to an impartial jury and consequently a fair trial. Brown further contends the evidence was insufficient to support the conviction for first-degree murder because it did not support a finding that he was the shooter. Finally, he contends the district court erred in denying his motion for new trial where the jury verdict was against the weight of the evidence.

## II.    ANALYSIS.

### A.    Motion for Mistrial Based on Publication of Prospective Juror's Personal Information.

We review the trial court's denial of a motion for mistrial for an abuse of discretion. *State v. Frei*, 831 N.W.2d 70, 73-74 (Iowa 2013). Because "[i]t is in the best position to appraise the effect of any alleged misconduct, we allow the district court broad discretion in deciding whether to grant a mistrial." *Id.* at 80. To establish reversible error, Brown must show that the reporter publishing the prospective juror's personal information and the court's conduct in informing the remaining prospective jurors "resulted in prejudice that deprived [him] of a fair trial." *Id.* "'The party claiming prejudice bears the burden of establishing it.'" *Id.* at 80-81 (quoting *State v. Anderson*, 448 N.W.2d 32, 33 (Iowa 1989)).

It is fundamental that a criminal defendant has the right to trial by an impartial jury. *See* Iowa Const. art. 1 § 10; United States Const. Amend. VI. There is also a First Amendment right guaranteeing the press and general public a right of access to criminal trials. *State v. Knox*, 464 N.W.2d 445, 447 (Iowa 1990). "[T]he right to an open trial may give way in certain cases to other rights

or interests, such as the defendant's right to a fair trial." *Waller v. Georgia*, 467 U.S. 39, 45 (1984).

The State of Iowa balances these rights by way of its court rules on "expanded news media coverage." *See* Iowa Ct. R. ch. 25. These rules were recently amended with new changes made effective May 1, 2014, and therefore, in effect at the time of the trial. "Expanded news media coverage" includes "broadcasting, recording, photographing, and live electronic reporting of judicial proceedings by the news media for gathering and disseminating news in any medium." Iowa Ct. R. 25.1(1). "Judicial proceedings" include "all public trials, hearings, or other proceedings in a trial or appellate court, for which expanded news media coverage is requested, *except those specifically excluded by this chapter*." Iowa Ct. R. 25.1(4) (emphasis added). The rules specify, "Expanded news media coverage of jury selection is prohibited." Iowa Ct. R. 25.2(6). Although "blogging" is not explicitly included as a form of news media coverage, it is a form of "live electronic reporting"[4] consistent with the definition provided in rule 25.1(1), therefore, the reporter's publication in this case falls within the rules on "expanded news media coverage." Accordingly, blogging of the jury selection was prohibited.

Brown argues the reporter's live-blogging of the prospective juror's name and personal information and the court subsequently informing the remaining jury

---

[4] "'*Live electronic reporting*' covers tweeting, blogging, and future methods of real time electronic reporting by text. It does not include photography or video." Summary of Amendments to Chapter 25 of the Iowa Court Rules on Expanded News Media Coverage Rules, approved by the Iowa Supreme Court, April 2, 2014. Effective May 1, 2014, p.1, http://www.iowacourts.gov/Court_Rules_Forms/Recent_Amendments_New_Iowa_Court_Rules/.

pool of that incident had a chilling effect on the remainder of the jury selection process. Brown cites *In re S. Carolina Press Ass'n*, 946 F.2d 1037, 1033 (4th Cir. 1991), for the proposition that, "[F]ear of publicity that might be given to answers of venirepersons during *voir dire* may so inhibit or chill truthful responses that an accused is denied the fair trial to which he is entitled under the Fourteenth Amendment." Rather, "[f]ull and frank answers from potential jurors, when they are questioned in voir dire are essential to the process of selecting [a fair and impartial] jury." *Carolina Press*, 946 F.2d at 1033.

Brown contends the fear of publicity was an issue in this case because the jury was required to discuss sensitive topics such as race and gun violence, which were important aspects of the voir dire. Brown argues, once the jury pool was aware of the publication of the prospective juror's information, he was unable to elicit forthright and honest responses to his questions. Brown adduces no evidence in support of his argument. He does not point to a single instance in which a prospective juror was, even speculatively, unable to give an honest answer to his voir dire question, although voir dire continued and the parties selected and empaneled a jury. On our examination of the voir dire transcript, we note that only three more prospective jurors were questioned during the remaining voir dire. One was excused in anticipation of a medical appointment. The second expressed a concern that the defendant was black and everyone else in the courtroom was white. The prosecutor asked the prospective juror if he could be fair in spite of that concern and if it mattered that the victim of the crime was also black. The juror stated he could be fair and the race of the victim

did not matter. The prosecutor asked the third prospective juror if he could be fair. He stated yes. Defense counsel then asked the second and third jurors about their employment, hobbies, and various other topics, none of which related to race or gun violence. Brown does not point to any moment during the remainder of voir dire when a juror's answer seemed untruthful or dishonest or even hesitant. He contends the "chilling effect" is not discernable from "the black and white transcript." However, he also cites no authority for presuming or assuming there was a chilling effect on this record.

Furthermore, Brown fails to present any argument as to why, even theoretically or presumptively, the potential jurors' fear of publicity would have produced a biased jury and, consequently, how the incident resulted in prejudice to him. No juror expressed any concern, as the struck juror had, that publicity of their name or other personal details would affect him or her negatively. Further, even if the jurors were initially concerned about the possibility that their personal information and responses would be published, the court made several efforts to mitigate the concerns. The court informed the prospective jurors that the reporter had agreed to take down the blog post and had done so immediately and permanently. The court assured the prospective jurors that it had discussed the situation with the three reporting bloggers in the room and they had all agreed not to live-blog the remainder of the jury selection. The court made a guarantee that no further blogging of the jury selection would take place. The court also surveyed the jury pool multiple times to see if anyone had been contacted in relation to the live-blogging. There is no evidence that the impanelled jury was

affected by the incident of the struck juror nor is there any evidence that the impanelled jury was not an impartial one. Brown bears the burden of showing the incident resulted in prejudice that deprived him of a fair trial. He has failed to make that showing. Therefore, there was no abuse of discretion in the court's denial of the motion for mistrial. We affirm the court's order.

### B. Motion for New Trial Based on Weight of the Evidence.

Brown made a post-trial motion for new trial arguing the jury verdict was against the weight of the evidence.[5] The court denied the motion, and Brown renews the argument on appeal. Brown contends the verdict was "contrary to law or evidence." Iowa R. Crim. P. 2.24(2)(b)(6). He argues the weight of the credible evidence does not support a finding beyond a reasonable doubt that Brown shot Lindsey. Consequently, Brown argues, the district court abused its discretion in failing to grant the motion for new trial and this court should vacate and remand for a new trial.

We review denial of a motion for new trial for an abuse of discretion. *State v. Nichter*, 720 N.W.2d 547, 559 (Iowa 2006). "Trial courts have wide discretion in deciding motions for new trial." *State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998). "[T]his discretion [must be exercised] carefully and sparingly." *Id.* "[A] failure to follow [this admonition] would lessen the role of the jury as the principal trier of facts and would enable the trial court to disregard at will the jury's verdict." *Id.* "Contrary to . . . evidence" under Iowa Rule of Criminal Procedure

---

[5] Brown also argued he was entitled to a new trial due to the defects in the jury selection process. We have addressed that issue above, and we need not address it again for the purposes of the motion-for-new-trial argument.

2.24(2)(b)(6) means "contrary to the weight of the evidence." *Id.* Iowa courts distinguish the weight-of-the-evidence standard and the sufficiency-of-the-evidence standard as follows:

> A conviction rests upon insufficient evidence when, even after viewing the evidence in the light most favorable to the prosecution, no rational factfinder could have found the defendant guilty beyond a reasonable doubt. A reversal based on the weight of the evidence, on the other hand, draws the appellate court into questions of credibility. The weight of the evidence refers to a determination by the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.

*Id.* at 658 (quoting *Tibbs v. Florida*, 457 U.S. 31, 37-38 (1982)) (internal quotation marks omitted). Therefore,

> On a motion for new trial . . . the power of the court is much broader. It may weigh the evidence and consider the credibility of witnesses. If the court reaches the conclusion that the verdict is contrary to the weight of the evidence and that a miscarriage of justice may have resulted, the verdict may be set aside and a new trial granted . . . . [T]he power to grant a new trial on this ground should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.

*Id.* at 658-59 (citing Charles A. Wright, *Federal Practice and Procedure* § 553, at 245-48 (2d ed. 1982)).

Brown contends that Harris, Fisher, and Blosser were not credible witnesses because they did not volunteer information to law enforcement officers or cooperate with the investigation immediately. Harris admitted that he ran from the scene and did not approach police officers to volunteer information right away. However, he testified he had just been released from prison and was violating his parole by not abiding by the curfew and by drinking. However, when police officers approached him, he eventually gave a full account of the events.

Fisher testified he also did not volunteer information or cooperate with the investigation at first because he was scared and did not want anything to do it. Blosser testified she was scared and did not want to get involved. She also was aware Hardemon was on parole and present in Iowa in violation of parole. Further, as a felon, he could not lawfully possess a firearm. These are fairly common—and understandable—explanations for witnesses who are not immediately forthcoming. However, Harris, Fisher, and Blosser each eventually gave a full account of their activities and observations and testified at trial on behalf of the State. Brown points to no other factors and we find none that cast doubt on the witnesses' truthfulness.[6]

Brown points out various discrepancies in the evidence to argue the testimony was unreliable. Fisher testified that Harris also had a gun on the night of the shooting. Brown overstates the evidence. Fisher testified someone broke the glass on the front door to the apartment building with what he assumed was a gun. He also testified he was not sure Harris had a gun. Brown claims Blosser's mother's testimony contradicts Blosser's but does not explain how. Brown claims Brett Kriz denied that Blosser and Hardemon dropped off a box at his home. In fact, Kriz invoked the Fifth Amendment when asked about it and declined to answer further questions about any such item, stating, "I can't say." Harris and Fisher consistently testified that Brown shot Lindsey from a short distance and ran away. Blosser's testimony is supported by a telephone record showing that

---

[6] The State asserts Harris was convicted in 2008 of making false reports to law enforcement. When questioned about this conviction, Harris denied it. The State offered no other evidence of such a conviction. Therefore, we have no basis on which to believe such a conviction existed.

Brown did call Hardemon's cellular phone around the time on June 22 that she indicated. Brown also complains about the lack of physical evidence in the case connecting him to the shooting. He points out the gun was never located, nor were any spent shell casings. There were no fingerprints, DNA evidence, or surveillance video to link Brown to the incident.

We agree that there is little physical evidence in this case. However, there were two eye witnesses and Brown made an admission that he shot a man in the presence of a third witness. Further, Brown has not produced any evidence or cogent argument that the three main witnesses—Harris, Fisher, and Blosser—are not credible. Harris testified Brown approached him and Lindsey at his apartment building, walked a short distance away with Lindsey, then shot him from a few feet away, and ran away. Fisher also testified he personally saw Brown draw a gun and shoot Lindsey from a short distance, then run away. Both Harris and Fisher testified they heard four shots in rapid succession, although the medical examiner found five gunshot wounds. Blosser, although she did not witness the shooting, heard gunshots outside her apartment. At her boyfriend's insistence, she then immediately drove Brown out of Iowa City to Chicago. On the way to Chicago, she heard Brown say he shot a man. The weight of the evidence in this case heavily supports the jury's guilty verdict. Accordingly, the district court did not abuse its discretion in denying the motion for new trial.

**C.      Sufficiency of the Evidence for Submission to the Jury.**

Brown also appealed from denial of his motion for judgment of acquittal made at the close of the State's presentation of evidence. "Challenges to the sufficiency of the evidence are reviewed for correction of errors at law." *State v. Hansen*, 750 N.W.2d 111, 112 (Iowa 2008). "We allow a verdict to stand if substantial evidence supports it." *State v. Biddle*, 652 N.W.2d 191, 197 (Iowa 2002). "Evidence is substantial if it would convince a rational fact finder that the defendant is guilty beyond a reasonable doubt." *Id.* "We review the evidence in the light most favorable to the State, including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence." *Id.* "We consider all the record evidence, not just the evidence that supports the verdict." *Id.* "'[E]vidence which merely raises suspicion, speculation, or conjecture is insufficient.'" *State v. Hearn*, 797 N.W.2d 577, 580 (Iowa 2011) (quoting *State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992)).

Having reviewed the record and found that the weight of the evidence supports the verdict, we now consider the evidence in the light most favorable to the State and, after making all legitimate inferences and presumptions, we conclude there was substantial evidence from which the jury could find Brown guilty beyond a reasonable doubt. Accordingly, the district court committed no error when it denied the motion for judgment of acquittal.

## III.    CONCLUSION.

We find Brown failed to make the necessary showing that the impanelled jury was biased and that he was prejudiced as a result. We further find that the weight of the evidence rests heavily in support of the verdict. We also find the

evidence was sufficient to have been submitted to the jury.  Therefore, we affirm the denial of the motion for mistrial, the denial of the motion for new trial, and the verdict and judgment of guilty.

**AFFIRMED.**