# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

State of South Carolina, Petitioner,

v.

Jeroid J. Price, Defendant.

Appellate Case No. 2023-000629

---

## ON WRIT OF CERTIORARI TO THE COURT OF GENERAL SESSIONS

---

Appeal from Richland County
L. Casey Manning, Circuit Court Judge

---

Opinion No. 28177
Heard April 26, 2023 – Filed September 6, 2023

---

## ORDER VACATED

---

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General W. Jeffrey Young, Solicitor General Robert D. Cook, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Heather Savitz Weiss, all of Columbia, for Petitioner.

James Todd Rutherford, of The Rutherford Law Firm, LLC, of Columbia, for Defendant.

---

**JUSTICE FEW:** We issued a common-law writ of certiorari to review a "sealed" order of the circuit court reducing the prison sentence of Jeroid John Price and releasing him from prison after he served only nineteen years of his thirty-five-year sentence on his conviction for murder. We previously issued an order unsealing all

documents in the case. We now vacate the order for two reasons: (1) the circuit court did not have the authority to reduce the sentence because the solicitor and the circuit court did not comply with any of the requirements set forth in the applicable statute, and (2) the circuit court did not have the authority to close the proceedings to the public or seal the order. We remand the defendant to the custody of the South Carolina Department of Corrections.

## I.    Background

Price was convicted of murder in 2003 and sentenced to thirty-five years in prison. The facts of the murder and the procedural history of that case are set forth in our opinion affirming his conviction on direct appeal. *State v. Price*, 368 S.C. 494, 496-97, 629 S.E.2d 363, 364-65 (2006). The parties inform us Price began serving his sentence on December 23, 2003, and remained in prison until March 15, 2023. On that date, the Department of Corrections released Price pursuant to an order signed by now-retired circuit court judge L. Casey Manning on December 30, 2022.

There is no official record of the events that led to Judge Manning signing the order releasing Price from prison. It appears, however, that in February 2022, attorney J. Todd Rutherford—counsel for Price—contacted Solicitor Byron E. Gipson of the Fifth Judicial Circuit about reducing Price's sentence pursuant to section 17-25-65 of the South Carolina Code (2014). In mid-December 2022, Rutherford and Solicitor Gipson began exchanging emails with drafts of an order. According to Rutherford, he and Solicitor Gipson met privately with Judge Manning in late December in the judge's chambers. The Richland County "Case Management System Public Index" does not reflect that this meeting occurred, and there is no indication the meeting was recorded or transcribed. The victim's family was not notified of any of these events.

On December 30, Judge Manning signed two documents. The first document, entitled "ORDER REDUCING SENTENCE," provides,

> This Matter comes before this Court by Defendant, through his undersigned attorney, J. Todd Rutherford, who petitions this Court to Reduce the Defendant's Sentence: The Court finds the following facts to exist in this case:
> 1. That the Defendant was convicted of Murder . . . on December 19, 2003 and came to the South Carolina Department of Corrections on December 23, 2003.

2. That the Defendant was sentenced to a sentence of thirty-five years in prison by The Honorable Reginald I. Lloyd and has served approximately nineteen years to date.
3. Upon motion of the Solicitor in accordance with S.C. Code Ann. § 17-25-65.
4. An account of Defendant's cooperation is contained in an addendum attached to this Order.

THEREFORE, IT IS ORDERED that the sentence be reduced from thirty-five years to nineteen years.

The second document states only, "Order sealed this 30[th] day of December of 2022," without identifying the "Order" being sealed.

It appears Judge Manning placed both documents in a sealed envelope, signed his name across the seal, and wrote the date "12-30-22" on the exterior of the envelope. At an unknown point in time, the envelope was delivered to the clerk. The envelope bears no indication it contained an order or that the contents of the envelope related to any particular case. Neither the envelope nor the documents inside it have ever been file-stamped nor bear any other indication either of them were filed with the clerk of court. As of April 19, 2023, the public index contained no entry for any order subsequent to the clerk of court receiving this Court's remittitur from our decision in Price's direct appeal on May 9, 2006.

It is not known how the Department of Corrections obtained the order,[1] but the Department released Price from prison on March 15, 2023. Before March 15, as far as we can tell, the order was known to exist only by Rutherford, Solicitor Gipson, Judge Manning, and the circuit judge referenced in notes 1 and 3. Press accounts of Price's release began surfacing on April 17. On April 18, the Attorney General filed a motion in circuit court asking the order be unsealed for the preliminary purpose of allowing his office to review it. On April 19, Solicitor Gipson wrote the Chief Justice of this Court—with Rutherford's written consent—asking that the Court "release and unseal the Order." Also on April 19, Solicitor Gipson issued a press release in which he conceded, "An official Motion to Reduce the Sentence, pursuant

---

[1] At oral argument, Rutherford stated he believed another circuit judge sent the order to the Department of Corrections. We cannot verify this, as the event is not recorded in the public index. However, the events described in note 3—also not recorded in the public index—appear to support Rutherford's belief.

to 17-25-65, was never filed . . . ."  In the same press release, Solicitor Gipson requested "that this matter be reopened by the Court in order to ensure that all statutory rights and procedures are followed correctly."

On April 20—acting on our own initiative—this Court issued a common-law writ of certiorari.  *See* S.C. Const. art. V, § 5 ("The Supreme Court shall have power to issue writs or orders of injunction, mandamus, quo warranto, prohibition, certiorari, habeas corpus, and other original and remedial writs."); S.C. Code Ann. § 14-3-310 (2017) (same).[2]  Initially, in a written order entered on April 20, we "direct[ed] the Clerk of Court for Richland County to unseal the records relating to indictment number 2003-GS-40-2295, and make all such records public."  Apparently upon receiving our April 20 order, the clerk's office opened the sealed envelope, determined for the first time it contained what appeared to be a circuit court order reducing Price's sentence,[3] and entered the order in the public index, backdating the entry to December 30, 2022.  The "Order sealed" document—the second document Judge Manning signed—has never been entered in the public index.

---

[2] The term "writ of certiorari" is commonly used in American law to describe "an extraordinary writ issued by an appellate court, at its discretion, directing a lower court to deliver the record in the case for review."  *Certiorari*, BLACK'S LAW DICTIONARY (11th ed. 2019).  "Certiorari" is a Latin term that means "to be more fully informed."  *Id.*  A "writ" of certiorari is an order issued by an appellate court that has the effect of giving the appellate court the power to review—and if necessary reverse or vacate—the action of a lower court.  This Court uses a writ of certiorari in its ordinary course to exercise its power of discretionary review of the decisions of the court of appeals and post-conviction relief courts.  *See* Rule 242(a), SCACR ("The Supreme Court, or any two (2) justices thereof, may in its discretion, on motion of any party to the case or on its own motion, issue a writ of certiorari to review a final decision of the Court of Appeals."); Rule 243(a), SCACR ("A final decision entered under the Post-Conviction Relief Act shall be reviewed by the Supreme Court upon petition of either party for a writ of certiorari . . . .").  We discuss the common-law version of a writ of certiorari in more detail in section III of this opinion.

[3] The exterior of the envelope and the "Order sealed" document bear handwritten notations indicating another circuit judge opened the envelope on March 9 and "resealed" it on March 29.  These events were not entered in the public index, however, and there is no indication the clerk's office was aware they occurred or otherwise learned of the contents of the envelope before April 20.

Later on April 20, the Attorney General filed a petition with this Court on behalf of the State asking for an "extraordinary writ" and a declaration that the order releasing Price is void. As our April 20 writ of certiorari was still in effect when the State filed its petition, we proceeded to consider the merits of the State's petition without the necessity of issuing a separate writ. We held oral argument on the State's petition on April 26. Later that day, the Court granted the relief the State sought. We ordered,

> The circuit court's order of December 30, 2022, is hereby vacated, and the defendant Jeroid John Price is remanded to the custody of the Department of Corrections. *See* S.C. Code Ann. § 17-25-65 (2014); S.C. Const. art. I, § 9; S.C. Code Ann. § 14-5-10 (2017). Law enforcement authorities are directed to immediately take custody of the defendant and return him to the Department of Corrections to serve the remainder of his sentence. This Court will file a formal opinion explaining the basis for its decision.

Chief Justice Beatty and Justice James dissented.

This opinion—as promised—explains the basis for our decision.

## II.     Issues Before the Court

The unusual urgency with which the State's petition was presented to and heard by the Court warrants us clarifying the issues we find have been presented to the Court and which we have considered in resolving the petition. In doing so, we are mindful that neither the public nor the Attorney General had knowledge of the December 30 order or Price's release from prison until April 17, 2023. The Attorney General filed his petition on April 18, we held oral argument eight days later on April 26, and we signed the order granting relief in summary fashion also on April 26.

The threshold issue is whether the State presented any question upon which the Court may grant the relief the State requests on this common-law writ of certiorari. As we will explain in section III of this opinion, we find the State presented four questions that are properly before this Court pursuant to this Court's constitutional and statutory authority to issue a writ of certiorari.

Exercising this authority, we address the following questions in section IV of the opinion:

      A.      Did the circuit court have the authority under section 17-25-65 to reduce Price's prison sentence when the solicitor never filed a written motion seeking that reduction and neither the solicitor nor the circuit court otherwise complied with the requirements of the section?

      B.      Did the circuit court have the authority under law to close the proceedings to the public or seal the "ORDER REDUCING SENTENCE?"

      C.      Do the State's and the circuit court's violations of the Victims' Bill of Rights and the Victims' Rights Act warrant vacating the order?

      D.      Did the circuit court have the authority under section 17-25-65 to reduce Price's sentence below the legislatively-mandated minimum sentence?

We grant the State relief based on our "No" answers to questions A and B. We address the violations of the Victims' Bill of Rights and the Victims' Rights Act, but decline to grant the State relief on that basis. We address question D but do not answer the question.

### III.    This Court's Authority to Act

Article V, section 5 of the South Carolina Constitution and section 14-3-310 of the South Carolina Code provide, "The Supreme Court shall have power to issue writs or orders of . . . certiorari . . . ." Pursuant to this authority, we may use a common-law writ of certiorari to correct errors of law, particularly where a trial court exceeded its authority. *See City of Columbia v. S.C. Pub. Serv. Comm'n*, 242 S.C. 528, 532, 131 S.E.2d 705, 707 (1963) ("A writ of certiorari is used to keep an inferior tribunal within the scope of its powers." (citing *Ex parte Schmidt*, 24 S.C. 363, 364 (1886); *State ex rel. Martin v. Moore*, 54 S.C. 556, 560, 32 S.E. 700, 701 (1899))); *State v. Ansel*, 76 S.C. 395, 412, 57 S.E. 185, 191 (1907) ("The writ of *certiorari* is issued by a superior Court to an inferior judicial or quasi-judicial tribunal or officer to certify the record of trial to the superior Court for its review to ascertain whether the inferior tribunal . . . exceeded its powers, or committed substantial errors of law, but not to review the facts." (citing *Ex parte Riggs*, 52 S.C. 298, 302, 29 S.E. 645,

646 (1898))).[4]   In fact, this Court has previously used a common-law writ of certiorari to review a circuit court's unlawful post-final-judgment reduction of a criminal sentence.  *See State ex rel. McLeod v. Cnty. Ct. of Richland Cnty.*, 261 S.C. 478, 481, 200 S.E.2d 843, 844 (1973) ("The matters involved in this opinion are before the Court as a result of writs of *certiorari*, issued by the Chief Justice, ordering the Richland County Court to certify and return to this Court true copies of all records in any way affecting and relating to its orders amending the original sentences of the four individual respondents . . . .").  In *McLeod*, which we will discuss in more detail in section V, we declared "void" the order reducing the sentences of three defendants.  261 S.C. at 485-86, 200 S.E.2d at 846.  We will not, however, use a common-law writ of certiorari as a substitute for a party's right of appeal.  *Ex parte Gregory*, 58 S.C. 114, 115-16, 36 S.E. 433, 434 (1900).  Rather, as we said in *Moore*, "The writ of certiorari . . . will be granted or denied, in the discretion of the court, according to the circumstances of each particular case, as justice may require."  54 S.C. at 562-63, 32 S.E. at 702 (citation omitted).[5]

---

[4] In some of our older cases, we stated the Court may grant a common-law writ of certiorari if the lower court acted "without jurisdiction."  *See, e.g.*, *City of Columbia*, 242 S.C. at 532, 131 S.E.2d at 707; *Ansel*, 76 S.C. at 412, 57 S.E. at 190; *Ex parte Childs*, 12 S.C. 111, 114-15 (1879).  None of these cases, however, restrict our authority on a common-law writ of certiorari to *only* issues of jurisdiction.  Any statements we previously made suggesting our authority on a common-law writ of certiorari is limited to issues of jurisdiction were based on a view of the concept of subject matter jurisdiction that has now been corrected.  *See Allen v. S.C. Dep't of Corr.*, 439 S.C. 164, 167, 169, 886 S.E.2d 671, 672, 673 (2023) ("[W]e take this opportunity to address the confusion that has arisen in past jurisprudence" regarding "subject matter jurisdiction," and "The analysis of the issue in [an older case] as one of 'subject matter jurisdiction,' which has been repeated in several cases, was mistaken."); *State v. Gentry*, 363 S.C. 93, 99-101, 610 S.E.2d 494, 498-99 (2005) (explaining the difference between subject matter jurisdiction and the power of the court to act in a particular circumstance "[t]o end the confusion" "that has arisen in past jurisprudence"); *State v. Campbell*, 376 S.C. 212, 216, 656 S.E.2d 371, 373 (2008) (addressing a circuit court's unlawful post-final-judgment reduction of an inmate's sentence and stating, "When we used the 'lack of jurisdiction' language [in prior cases], we meant that the trial court simply no longer has the power to act . . . . However, framing the rule as a subject matter jurisdiction rule is incorrect.").

[5] We recently stated we may issue a common-law writ of certiorari whenever we find "exceptional circumstances exist" to warrant our doing so.  *Laffitte v. Bridgestone Corp.*, 381 S.C. 460, 471, 674 S.E.2d 154, 160 (2009) (citing *In re*

Section 17-25-65 contemplates the "circuit solicitor in the county where the defendant's case arose" will represent the State in a proceeding to reduce an inmate's sentence. As we explain in subsection IV.A, Solicitor Gipson failed to carry out this responsibility as required by the statute. The Attorney General stepped in pursuant to his authority under article V, section 24 of the South Carolina Constitution, which provides, "The Attorney General shall be the chief prosecuting officer of the State with authority to supervise the prosecution of all criminal cases in courts of record." The Attorney General's intervention is proper because—as we explain in subsections A and B of section IV—the circuit court committed errors of law and exceeded its authority.[6] In these two subsections, we explain the circuit court exceeded its authority by violating two fundamental principles of law. First, all of our courts are bound to follow clear and unambiguous statutory law. Second, our courts are presumptively open and thus, no court proceedings may be closed and no court records may be sealed from public view unless the closing or sealing is authorized by a specific provision of law. Both of these errors warrant our issuing of the writ of certiorari and vacating the December 30 order. *See infra* section V.

## IV. Analysis of Issues

We begin with a short analysis of the history and purpose of section 17-25-65. Historically, South Carolina trial courts had no authority to reduce a sentence after it became final. *McLeod*, 261 S.C. at 484, 200 S.E.2d at 845; *State v. Best*, 257 S.C. 361, 372-73, 186 S.E.2d 272, 277 (1972); *see State v. Davis*, 375 S.C. 12, 16, 649 S.E.2d 178, 180 (Ct. App. 2007) (holding "once the Sentencing Judge's order became final, . . . he . . . would [not] be permitted to alter the sentence" (citing *Best*, 257 S.C. at 373-74, 186 S.E.2d at 277-78)). In 2010, our General Assembly enacted the

---

*Breast Implant Prod. Liab. Litig.*, 331 S.C. 540, 543 n.2, 503 S.E.2d 445, 447 n.2 (1998)). In making this statement, we did not intend to create an additional standard for the issuance of a common-law writ of certiorari. Rather, we simply recognized the Court is not required to issue any writ, and doing so is in our discretion.

[6] We respectfully disagree with the dissent's contention a section 17-25-65 proceeding is "not a criminal prosecution" and thus, the Attorney General's article V, section 24 authority is not implicated. While such a proceeding is certainly an unusual part of a criminal proceeding, a section 17-25-65 sentence reduction is no less part of "the prosecution of [a] criminal case[]" than the initial sentencing hearing and order.

Omnibus Crime Reduction and Sentencing Reform Act. Act No. 273, 2010 S.C. Acts 1937, 1944. This comprehensive legislation—made up of 102 pages comprising sixty-six sections—defined new crimes, redefined certain existing crimes, increased sentences for many crimes, set some new mandatory minimum sentences, and addressed post-sentencing issues such as parole, supervised release, and sentence reductions. In section 13 of the Act—at the request of the Attorney General and the circuit solicitors[7]—the General Assembly enacted section 17-25-65. 2010 S.C. Acts at 1953-54. The State's purposes for requesting legislation permitting reductions of final sentences included creating an incentive for inmates to cooperate with law enforcement authorities and prosecutors to solve other crimes and promote safety within the prisons.

Because the reduction of an inmate's sentence pursuant to the section has the effect of undoing the final judgment of the sentencing court, however, our General Assembly set out particular requirements that must be met before a circuit court may even consider granting the State's request for a reduction. It is the joint responsibility of the State, the circuit court, and if necessary this Court, to ensure strict compliance with the requirements of section 17-25-65. As we will discuss below, these statutory requirements include (1) the circuit solicitor must file a written motion with the clerk of court, (2) the circuit solicitor must "send a copy" of the motion "to the chief judge of the circuit within five days of filing," and (3) the chief judge or a judge "assigned to that county" must conduct a hearing. § 17-25-65. In addition, based on constitutional and other statutory provisions we discuss below, (4) the hearing must be held in open court, and (5) the hearing must be on the record.

> **A.** **The Circuit Court's Authority under Section 17-25-65—The Requirements of Written Motion, Hearing on the Record, etc.**

---

[7] Section 17-25-65 was also enacted on the recommendation of the South Carolina Sentencing Reform Commission, which was created by the General Assembly by Joint Resolution in 2008. J. Res. No. 407, 2008 S.C. Acts 4199. "The primary duty of the Sentencing Reform Commission [was] to prepare a comprehensive report . . . " due "no later than June 1, 2009." 2008 S.C. Acts at 4200. In the report, the Commission recommended: "Enact legislation . . . to allow for a reduction in sentencing or downward departure for an offender who, after sentencing, provides substantial assistance to a law enforcement agency, solicitors' office, or the Department of Corrections." South Carolina Sentencing Reform Commission, *Report to the General Assembly* 24 (2010).

The modern authority to reduce a final sentence derives exclusively from the General Assembly's enactment of section 17-25-65 in 2010. *Cf. Aiken v. Byars*, 410 S.C. 534, 537, 765 S.E.2d 572, 573 (2014) (holding certain juveniles who received a sentence of life without parole "are entitled to *re*sentencing" on constitutional grounds (emphasis added)).

Section 17-25-65 allows a circuit court to reduce an inmate's sentence under limited circumstances. First, subsections (A) and (B) of the statute plainly require the State file a motion before the circuit court has the authority to act. *See* § 17-25-65(A) ("Upon the state's motion . . . the court may reduce a sentence . . . ."); § 17-25-65(B) (same). Subsection (C) of the statute further provides, "A *motion* made pursuant to this provision *shall be filed* by that circuit solicitor in the county where the defendant's case arose." § 17-25-65(C) (emphasis added). Rule 4(a) of the South Carolina Rules of Criminal Procedure requires, "An application to the court for an order shall be by motion which, unless made during a hearing or trial in open court with a court reporter present, shall be made in writing, shall state with particularity the grounds therefor, and shall set forth the relief or order sought." It is clear, therefore, that section 17-25-65 requires the circuit solicitor to *file* a *written motion* before the circuit court is empowered to consider reducing an inmate's sentence.

Second, subsection 17-25-65(C) provides, "The State shall send a copy to the chief judge of the circuit within five days of filing."[8] As this Court has held, "The term 'shall' in a statute means that the action is mandatory." *Johnston v. S.C. Dep't of Lab., Licensing, & Regul., S.C. Real Est. Appraisers Bd.*, 365 S.C. 293, 296-97, 617 S.E.2d 363, 364 (2005) (citing *Wigfall v. Tideland Utils., Inc.*, 354 S.C. 100, 111, 580 S.E.2d 100, 105 (2003)).

Third, section 17-25-65 clearly requires a hearing conducted by the chief judge of the circuit or another circuit judge assigned to the county by the Chief Justice. *See* § 17-25-65(C) ("The chief judge or a circuit court judge currently assigned to that county shall have jurisdiction to *hear* and resolve the motion." (emphasis added)).

Fourth, as we will explain in subsection IV.B.1, article I, section 9 of the South Carolina Constitution provides, "All courts shall be public." When a statute requires a hearing—as here—the hearing is presumptively open to the public.

---

[8] This provision further supports the requirement of a written motion filed with the clerk of court, as there can be no "copy" of a non-written motion.

Fifth, as we also explain in the same subsection of our opinion, section 14-5-10 of the South Carolina Code (2017) provides, "The circuit courts herein established shall be courts of record . . . ." The circuit court's hearing on a section 17-25-65 sentence reduction, therefore, must be recorded.

These statutory and constitutional requirements serve several important functions, all of which are relevant to this case. First, the motion is a public document. When filed with the clerk of court, it is available to any victims, the Attorney General, the press, and the public as notice that the circuit solicitor seeks to have an inmate released before the expiration of his sentence. *See Thornton v. Atl. Coast Line R. Co.*, 196 S.C. 316, 324, 13 S.E.2d 442, 446 (1941) (discussing the importance of public filing of orders as "constructive notice" to the parties and stating, "Constructive notice must be sustained by an available record to which a member of the public could have access and could find in the Clerk's office, such as deeds, mortgages, etc., which are indexed and entered of record.").[9] This, in turn, gives any interested party—including law enforcement authorities—an opportunity to be heard to support or protest the proposed release. In the case of the Attorney General, knowledge the motion has been filed enables him to comply with his obligations under subsection 16-3-1560(D) of the Victims' Rights Act.[10] Finally as to the written motion, it provides all interested parties the factual and legal basis for the request. The requirement of an open and officially recorded hearing protects against the potential abuses we discuss in subsection IV.B.1.

By signing the "ORDER REDUCING SENTENCE" without Solicitor Gipson's compliance with the section 17-25-65 requirement of filing a written motion seeking the reduction of the inmate's sentence, without a copy of the motion having been provided to the chief judge of the circuit, and without otherwise complying with the statutory requirements, Judge Manning committed multiple errors of law and acted outside his authority. We are greatly troubled by the fact that neither Solicitor

---

[9] The referenced discussion and quoted language comes from the order of the circuit court, which this Court "direct[ed] . . . be reported, and . . . adopted as a part of this opinion." 196 S.C. at 331, 13 S.E.2d at 448.

[10] Because no motion was filed in this case, and the Attorney General was not otherwise notified of the proceeding, he was prevented from complying with this requirement.

Gipson nor Judge Manning made any effort to comply with even one of the requirements of section 17-25-65.

## B. Exclusion of the Public from the Proceedings and Sealing of the Order

The next question we address is whether the law permitted Judge Manning to conduct a closed hearing or seal the "ORDER REDUCING SENTENCE." The short answer is "No."

### 1. Constitutional and Statutory Requirements for Open Courts

Article I, section 9 of the South Carolina Constitution provides, "All courts shall be public . . . ." Section 14-5-10 provides, "The circuit courts herein established shall be courts of record, and the books of record thereof shall, at all times, be subject to the inspection of any person interested therein." The First Amendment—as "recognized" by the Supreme Court of the United States—protects a public "right of access to various aspects of a criminal prosecution." *In re Hearst Newspapers, L.L.C.*, 641 F.3d 168, 175 (5th Cir. 2011). The Fourth Circuit has held "the First Amendment right of access extends to [sentencing] hearings." *In re Washington Post Co.*, 807 F.2d 383, 389 (4th Cir. 1986); *see also Hearst Newspapers*, 641 F.3d at 176 (stating all federal circuit courts that have considered the question held "the public and press have a First Amendment right of access to sentencing proceedings"). This Court has stated, "Judicial proceedings and court records are presumptively open to the public under the common law, the First Amendment of the federal constitution, and [article I, section 9 of] the state constitution." *Ex parte Cap. U-Drive-It, Inc.*, 369 S.C. 1, 10, 630 S.E.2d 464, 469 (2006).

We have strictly applied this constitutional requirement that courts be open to the public and the press. We held "the decision of a judge to close any proceeding must be supported by findings which explain the balancing of interests and the need for closure of the proceeding." *Ex parte Columbia Newspapers, Inc.*, 286 S.C. 116, 119, 333 S.E.2d 337, 338 (1985). We also held,

> [T]he courtroom may be closed only if specific findings are made that (1) there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity, (2) there is a substantial probability that closure would prevent that prejudice, and (3) reasonable

> alternatives to closure could not adequately protect the
> defendant's rights.

*Ex parte Hearst-Argyle Television, Inc.*, 369 S.C. 69, 74, 631 S.E.2d 86, 89 (2006); *see also In re Greenville News*, 332 S.C. 394, 396-97, 505 S.E.2d 340, 341 (1998) (reciting the same requirements).

If a section 17-25-65 sentence-reduction proceeding is any different from the sentencing proceeding addressed in *Washington Post* and *Hearst Newspapers*, or the proceedings we addressed in *Columbia Newspapers*, *Greenville News*, or *Hearst-Argyle Television*, the reasons for public access to a section 17-25-65 proceeding are even stronger.[11]

The following comments from the Supreme Court of the United States were made in a different factual context, but they are no less relevant here:

---

[11] The test for determining whether the First Amendment applies to a certain criminal proceeding requires a court to consider two things: "whether the . . . proceeding at issue has traditionally been . . . open," and "whether public access . . . would tend to operate as a curb on prosecutorial or judicial misconduct and would further the public's interest in understanding the criminal justice system."  *Washington Post*, 807 F.2d at 389; *see also Hearst Newspapers*, 641 F.3d at 175 ("The Supreme Court has developed a two-part test for determining whether there is a First Amendment right of access to a particular criminal proceeding: (1) whether the proceeding has historically been open to the public and press; and (2) 'whether public access plays a significant positive role in the functioning of the particular process in question.'" (quoting *Press-Enter. Co. v. Superior Ct. of California for Riverside Cnty.*, 478 U.S. 1, 8, 106 S. Ct. 2735, 2740, 92 L. Ed. 2d 1, 10 (1986))); 641 F.3d at 175 ("This test has been referred to as the 'experience' and 'logic' test."); *see also Ex parte The Island Packet*, 308 S.C. 198, 201, 417 S.E.2d 575, 577 (1992) (reciting this test).  While our "experience" with section 17-25-65 is short, the statute itself requires a public motion and a hearing, and we are not aware of any other instance in which a circuit court has closed or sealed any portion of a section 17-25-65 proceeding.  In addition, the "logic" supporting a First Amendment right of access was conclusively demonstrated by what happened in this particular case.  *See infra* section V. Experience *and* logic insist that when a court considers reducing a sentence that has become the final judgment of the court, all aspects of the proceeding—from the solicitor's motion required by the statute to the hearing and order—be open to the public.

> The knowledge that every criminal [proceeding] is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.

*In re Oliver*, 333 U.S. 257, 270, 68 S. Ct. 499, 506, 92 L. Ed. 682, 692 (1948).

Then quoting Jeremy Bentham, the *Oliver* Court stated,

> [S]uppose the proceedings to be completely secret, and the court, on the occasion, to consist of no more than a single judge,—that judge will be at once indolent and arbitrary: how corrupt soever his inclination may be, it will find no check, at any rate no tolerably efficient check, to oppose it. Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account.

333 U.S. at 271, 68 S. Ct. at 506, 92 L. Ed. at 693 (quoting 1 Jeremy Bentham, *Rationale of Judicial Evidence* 524 (London, Hunt & Clarke 1827)).

### 2.     Law Authorizing Sealing Court Records

Pursuant to the First Amendment to the United States Constitution, article I, section 9 of the South Carolina Constitution, and section 14-5-10 of the South Carolina Code, no South Carolina court—not this Court, the court of appeals, nor any trial court—may seal any portion of a court record from public view unless there is a specific provision of law permitting it. While we have recognized limited instances in which a court may use its inherent power to restrict public access to sensitive information "such as matters involving juveniles, legitimate trade secrets, or information covered by a recognized privilege," *Cap. U-Drive-It*, 369 S.C. at 10, 630 S.E.2d at 469, we emphasize such inherent power is very narrow.

We have attempted on numerous occasions to make clear to the public, to the bench, and to the bar that the sealing of any part of a court record is a serious matter requiring lawful authority and specific findings of fact that justify the sealing. *See, e.g.*, *Davis v. Jennings*, 304 S.C. 502, 506, 405 S.E.2d 601, 604 (1991) (requiring "when a protective order sealing the record is sought, the trial court shall make specific factual findings, on the record"); *Cap. U-Drive-It*, 369 S.C. at 12, 630 S.E.2d

at 470 (same).  In 2003, this Court adopted Rule 41.1 of the South Carolina Rules of Civil Procedure.  We explained in the "Purpose" section,

> Because South Carolina has a long history of maintaining open court proceedings and records, this Rule is intended to establish guidelines for governing the filing under seal of settlements and other documents.  Article I, § 9, of the South Carolina Constitution provides that all courts of this state shall be public and this Rule is intended to ensure that that Constitutional provision is fulfilled.

Rule 41.1(a), SCRCP.

Although Rule 41.1 is not directly applicable in criminal court, it illustrates the level of detailed documentation the law requires of the party asking for sealing and of an appellate, circuit, or family court considering granting the request.

### 3.      Closed Proceeding and Sealing Order in this Case

Turning to the proceedings in this case, Judge Manning made no attempt to determine whether the law permitted any portion of the proceedings to be closed to the public.  First, there is nothing in section 17-25-65 providing for closure of the proceeding.  Second, under general provisions applicable to all court proceedings, "Judicial proceedings . . . are presumptively open to the public . . . ." *Cap. U-Drive-It*, 369 S.C. at 10, 630 S.E.2d at 469.  To overcome this presumption, the party seeking to close any proceeding must present evidence supporting the closure, and the court considering closure must make specific "findings which explain the balancing of interests and the need for closure of the proceeding," *Columbia Newspapers*, 286 S.C. at 119, 333 S.E.2d at 338, including the three specific findings required by *Hearst-Argyle Television*, 369 S.C. at 74, 631 S.E.2d at 89.

In *Columbia Newspapers*, *Greenville News*, and *Hearst-Argyle Television*, this Court addressed the closure of the proceeding and vacated or reversed the closure order even though the issue had become moot.  *See Columbia Newspapers*, 286 S.C. at 118, 119, 333 S.E.2d at 338 (finding the issue moot yet vacating the closure order); *In re Greenville News*, 332 S.C. at 397, 505 S.E.2d at 342 (vacating the order closing a pre-trial hearing long after the trial was completed); *Hearst-Argyle Television*, 369 S.C. at 73, 80, 631 S.E.2d at 88, 92 (finding the issue moot, yet reversing the closure order).  Here, the issue is not moot.  On the merits, therefore, Judge Manning did nothing to determine whether the law permitted closure of the proceedings.  His

hosting of a private meeting in his chambers instead of conducting an open hearing is a clear violation of the First Amendment and article I, section 9 of the South Carolina Constitution. Thus, the closure of the proceedings in this case was an error of law beyond the authority of the circuit court.

As to Judge Manning's attempt to seal the "ORDER REDUCING SENTENCE," we begin by making clear that even if there were lawful authority to seal a portion of the record here, and even if there were a sufficient factual basis to support sealing a portion of the record here,[12] the order itself should never have been sealed. To illustrate the importance of this point, the sealing of an order related to the conviction or sentencing of a criminal defendant prevents the clerk of court from complying with subsection 14-17-325(A) of the South Carolina Code (Supp. 2022), which provides, "Every clerk of court shall report the disposition of each case in the Court of General Sessions to the State Law Enforcement Division within five days of disposition . . . ."

In an appropriate case, if there is legal authority and a sufficient factual basis, the circuit court may issue an order sealing a portion of a court record. But the act itself—the order of the court—must never be sealed unless specifically permitted by statute. *See, e.g.*, S.C. Code Ann. § 17-30-100(C) (2014) (mandating that orders authorizing interception of electronic communications must be sealed); S.C. Code Ann. § 63-7-2600 (2010) (requiring sealing of "all court records" related to termination of parental rights). Without such specific statutory authority, an order of the court "shall, at all times, be subject to the inspection of any person interested therein." § 14-5-10.

Here, however, there is no authority to seal anything.[13] Far from there being any provision of law that permitted the sealing of this order, the sealing of the order is

---

[12] Throughout this opinion we have made reference to sealing a "portion" of a court record. The use of this language is intentional, as it is *never* permitted under law to seal the entire file of a case, under any circumstance, except as specifically provided by law. *See, e.g.*, S.C. Code Ann. § 15-49-20(K) (Supp. 2022) ("Upon the petitioner's request, after granting the name change, the court shall seal the file *if* the court finds that the safety of the petitioner seeking the name change or the safety of the petitioner's child or ward warrants sealing the file." (emphasis added)).

[13] At oral argument, counsel for Price argued it was necessary to seal the information underlying the decision to release Price from prison "to protect the identity of someone that was still in the Department of Corrections in recognition that telling

contrary to subsection 14-17-325(A) which requires a clerk of court to report the sentence reduction to SLED. Judge Manning did nothing to determine whether the law permitted the sealing of any portion of the court record. Therefore, the law did not permit Judge Manning to seal the "ORDER REDUCING SENTENCE." Judge Manning acted outside his authority and committed an error of law.

### C. Victims' Bill of Rights and Victims' Rights Act

The State contends we should vacate the order on the ground the solicitor and the circuit court violated the Victims' Bill of Rights and the Victims' Rights Act. We agree the solicitor and the circuit court violated both.

In February 1998, our General Assembly amended the Constitution of South Carolina to add the Victims' Bill of Rights by ratifying the vote of the people of South Carolina in the 1996 general election. S.C. Const. art. I, § 24; Act No. 259, 1998 S.C. Acts 1835, 1836-38. Among its many important provisions, the Victims' Bill of Rights provides,

> To preserve and protect victims' rights to justice and due process . . . , victims of crime have the right to . . . be informed of any proceeding when any post-conviction action is being considered, and be present at any post-conviction hearing involving a post-conviction release decision.

---

the world—including the victims in this case—what happened and who was involved, that it would put his life in jeopardy." While we are sensitive to these concerns, the criminal justice system confronts situations on a regular basis in which confidential informants, cooperating codefendants, and other witnesses provide information that will put their lives or safety at risk when their cooperation is discovered by those implicated. We are certain the General Assembly was aware of this concern when it enacted section 17-25-65, yet the General Assembly chose not to address the concern. We find Price's alleged cooperation with the State documented in the materials submitted to Judge Manning does not differ in any significant manner from the same type of cooperation that becomes public on a regular basis in other cases. We are confident that to the extent any such concern for the safety of a cooperating inmate arises in the future, the State, counsel for the inmate, and the circuit court may effectively deal with that concern without sealing any portion of the record.

S.C. Const. art. I, § 24(A)(10).

The General Assembly implemented the Victims' Bill of Rights by enacting the Victims' Rights Act. *See* S.C. Code Ann. §§ 16-3-1505 to -1565 (2015 & Supp. 2022). Pursuant to the Victims' Rights Act, "The prosecuting agency[14] reasonably must attempt to notify each victim of each hearing, trial, or other proceeding. This notification must be made sufficiently in advance to allow the victim to exercise his rights contained in this article." § 16-3-1545(I). The "rights contained in this article" include the right to "attend" the proceeding. *See Ex parte Littlefield*, 343 S.C. 212, 218, 540 S.E.2d 81, 84 (2000) (stating "the rights granted to the victims by the Victims' Bill of Rights . . . include[] the right to be informed of and attend any criminal proceeding which is dispositive of the charges where the defendant has the right to be present"). "A circuit . . . court judge, before proceeding with a trial, plea, sentencing, or other dispositive hearing in a case involving a victim, must ask the prosecuting agency to verify that a reasonable attempt was made to notify the victim sufficiently in advance to attend." § 16-3-1550(D). The Attorney General has a separate, mandatory obligation under subsection 16-3-1560(D) to "confer with victims regarding the defendant's appeal and other post-conviction proceedings."

There can be no doubt that an attempt to reduce an inmate's sentence under section 17-25-65 is a "proceeding" governed by the Victims' Bill of Rights and the Victims' Rights Act.[15] The solicitor's failure to notify the victim's family of the proceeding

---

[14] The "prosecuting agency" is defined as "the solicitor, Attorney General, . . . or any person or entity charged with the prosecution of a criminal case . . . ." § 16-3-1510(5).

[15] The General Assembly used "post-conviction proceedings" in the Victims' Rights Act in a way that clearly includes more than just post-conviction relief proceedings under the Uniform Post-Conviction Procedure Act in Chapter 27 of Title 17 of the South Carolina Code. S.C. Code Ann. § 16-3-1560(A) (defining "proceedings affecting the probation, parole, or release of the offender" and proceedings under the sexually violent predator act as "post-conviction proceedings"); § 16-3-1560(F) ("The Attorney General reasonably must attempt to notify a victim of all post-conviction proceedings" including proceedings under the sexually violent predator act); *see also State v. Barlow*, 372 S.C. 534, 538, 643 S.E.2d 682, 684 (2007) (applying right to attend post-conviction proceeding to probation revocation hearing).

and the circuit court's failure to inquire whether the solicitor did so violated both the Victims' Bill of Rights and the Victims' Rights Act.

However, both the Victims' Bill of Rights and the Victims' Rights Act contain provisions indicating failure to comply should not be cause to invalidate or set aside the orders of a court. *See* S.C. Const. art. I, § 24(C)(1) ("A victim's exercise of any right granted by this section is not grounds for dismissing any criminal proceeding or setting aside any conviction or sentence."); § 16-3-1565(B) ("A sentence must not be invalidated because of failure to comply with the provisions of this article."). In the past, our appellate courts have not used violations of the Victims' Bill of Rights or Victims' Rights Act to overturn any action by a trial court. *See Littlefield*, 343 S.C. at 223, 540 S.E.2d at 87 (refusing "to re-open a case" based on violations of the Victims' Rights Act). While we stress to all participants in the criminal justice system the critical importance of compliance with the Victims' Bill of Rights and the Victims' Rights Act, under article I, section 24(C)(1), subsection 16-3-1565(B), and the reasoning of *Littlefield*, we decline to grant the State relief on the basis of these violations.

### D. The Circuit Court's Authority under Section 17-25-65— Mandatory Minimum Sentences

The State contends a circuit court does not have the authority under section 17-25-65 to reduce a murder sentence. In its April 20 petition, the State argued a person convicted of murder "is not eligible for any credit that would reduce the sentence below the mandatory minimum of 30 years." At oral argument, the State argued no murder sentence may be reduced *at all* because of the specific language the General Assembly included in subsection 16-3-20(A) of the South Carolina Code (2015). That subsection provides,

> No person sentenced to a mandatory minimum term of imprisonment for thirty years to life pursuant to this section is eligible for parole or any early release program, nor is the person eligible to receive any work credits, education credits, good conduct credits, or any other credits that would reduce the mandatory minimum term of imprisonment for thirty years to life required by this section.

The State argues that because section 17-25-65 does not authorize a circuit court to reduce a murder sentence of any length, the "ORDER REDUCING SENTENCE" is void. We find it unnecessary to reach the merits of this argument.

## V.    Circumstances Warranting Vacating the December 30 Order

In this case, justice requires we exercise our discretion to vacate the "ORDER REDUCING SENTENCE" pursuant to our April 20 writ of certiorari. We have explained the two fundamental violations of law that led to this order: Solicitor Gipson's failure to follow the law in making the request for a sentence reduction—without satisfying any of the requirements set forth in the statute; and the closing of the proceedings and the sealing the order in violation of federal and state constitutional law and a long line of decisions of this Court. Both of these failures were necessary to facilitate Solicitor Gipson's plan to keep the public from knowing that Gipson agreed to have this convicted murderer released early. The plan worked, until the press found out about Price's release, until this Court exercised its constitutional authority to issue a writ of certiorari and unsealed all documents, until the Attorney General stepped in to demand the law be followed. This case demonstrates the wisdom of our General Assembly in including the specific requirements of section 17-25-65 that must be satisfied before an inmate's sentence may be reduced. This case reminds us of the critical importance of open courts and the reasons court orders may not be sealed. This case validates the Attorney General's supervisory authority over the circuit solicitors pursuant to article V, section 24. With due respect for the dissent's position to the contrary, it is not *despite* the fact Solicitor Gipson had the power to represent the State in seeking this sentence reduction that we find it necessary to act. It is *because* Solicitor Gipson in doing so—and Judge Manning in signing the order—fundamentally failed to follow the law; it is for this reason that we exercise our authority to vacate the order pursuant to a writ of certiorari under article V, section 5 and section 14-3-310. When circumstances such as these arise, it is the constitutional and statutory duty of this Court to act.

The dissent criticizes us for "undo[ing] the proceedings" by vacating the "ORDER REDUCING SENTENCE" instead of simply standing on our April 20 order unsealing it. We find ample support in our prior decisions to vacate the order. We begin with *State ex rel. McLeod v. County Court of Richland County*. In that case, four defendants were convicted of unrelated crimes in the former County Court of Richland County between 1969 and 1972, sentenced to prison terms, and serving their sentences. 261 S.C. at 482-85, 200 S.E.2d at 844-46. In each case, however— six months or more after the original sentence was imposed—the sentencing judge

signed orders "purporting to amend the sentences originally imposed upon the individual respondent."  261 S.C. at 485-86, 200 S.E.2d at 846.  Reviewing those four orders on a common-law writ of certiorari, we found the issues as to one defendant moot, 261 S.C. at 485, 200 S.E.2d at 846, but held the other three orders reducing the original sentences were "void" because the judge who signed them did not have the authority to do so, 261 S.C. at 486, 200 S.E.2d at 846.  We vacated the orders and remanded the three defendants to the custody of the proper department to serve the remainder of their sentences.  *Id.*

The dissent includes a lengthy discussion of the cases we rely on involving closed proceedings and contends "those cases do not support [our] decision to vacate the sentence-reduction order."  In each of these cases, the dissent points out, the court simply reversed the order closing the proceedings; it did not vacate the order entered as a result of the proceedings.  Each of those cases—though authoritative on when a courtroom may be closed—is distinguishable from this case as to the appropriate remedy because the issue there arose under circumstances different from the compelling circumstances we face in this case.  First, in each of the cases, the existence of the case was publicly known, as opposed to this case in which the only proceeding was closed to the public and every document was sealed from public view.  In fact, in each of the cases, it was the press's knowledge of the closing of the proceedings that led to the filing of the action to open the proceedings.  In this case, on the contrary, neither the press, the public, the victims, law enforcement, nor the Attorney General had any idea even of the existence of the case until months after the final order was signed, and over a month after the order was acted upon to release Price from prison.

Second, in each of the cases, the order we reversed was an interlocutory order addressing one or more procedural issues in the case.  None of the orders we reversed in those cases was the final order in the case.  In this case, the closed proceeding and the sealed order that flowed from it involved the final order in the case, the one that released Price from prison.

The dissent also accuses us of "rescu[ing] the State from a problem it created."  We prefer to view it as rescuing the rule of law by fulfilling our responsibility to ensure that our government officials and courts act within their authority.  In this regard, there is no "follow[ing] the majority's approach to its logical extreme."  We simply decide this case on its unique and remarkably-egregious facts.  We cannot imagine that if the solicitor and the circuit court had followed the law the Attorney General would even attempt to intervene, nor certainly that this Court would grant the relief we find necessary here.

### VI. Conclusion

This Court has the power under article V, section 5 of our constitution and section 14-3-310 of our code of laws to issue a writ of certiorari to address any act of a lower court that is outside of that court's authority or otherwise contrary to law. Pursuant to article V, section 5 and section 14-3-310, for the reasons explained above, we find the "ORDER REDUCING SENTENCE" is both outside the circuit court's authority and contrary to law. We vacate the order and remand Jeroid John Price to the custody of the South Carolina Department of Corrections where he must serve the remainder of his thirty-five-year sentence for murder.

**ORDER VACATED.**

**KITTREDGE and HILL, JJ., concur. JAMES, J., dissenting in a separate opinion in which BEATTY, C.J., concurs.**

**JUSTICE JAMES:** A sentence reduction under section 17-25-65 is not possible unless the State of South Carolina asks for the reduction. Here, if the State had refused to ask for a sentence reduction for Price, that would have been the end of it. However, the State sought and obtained the very sentence reduction it now asks this Court to vacate. The State prepared the sentence-reduction order and presented it to the circuit judge for his signature. In doing so, the State created the unfortunate state of affairs the State now asks this Court to untangle. I would be the first to say that Price deserved every day of his 35-year sentence, but the Court should not be short-sighted and overlook the impact of today's decision; the process matters. We should not permit the State to resort to the judicial branch for relief from the State's own poor choices, as embarrassing as they may be for the State. Therefore, I dissent.

The majority vacates the sentence-reduction order for the following reasons: (1) because of certain procedural defects, the circuit court did not have authority to sign the order; (2) a hearing was not held; and (3) the order was improperly sealed. I believe the majority is wrong on each point. I agree with the majority's rejection of the State's contention that the order is void because the victims were not notified of the proceedings. In light of its decision to vacate the order, the majority does not reach the potential conflict between South Carolina Code section 17-25-65 (2014) and subsection 16-3-20(A) (2015). As I will discuss, the sentence-reduction provisions of section 17-25-65 are not impacted by subsection 16-3-20(A).

During oral argument, the Attorney General, appearing for the State, conceded the obvious when he said, "The State is the State is the State" and "the State failed." As I will repeat perhaps too many times, this Court should not relieve the State from an order the State procured.

## I. Background

Price was convicted of murdering Carl Smalls in 2003 and was sentenced to thirty-five years in prison. His conviction was affirmed by this Court in 2006. While in prison, Price allegedly assisted the South Carolina Department of Corrections (SCDC) in three particulars. The record shows the State relied upon all three in requesting the circuit court to reduce Price's sentence from thirty-five to nineteen years. First, according to an unsigned addendum attached to the circuit court's order, Price alerted SCDC at some point that a

fellow inmate had escaped from prison and been on the run for three days. Second, an SCDC inmate swore by affidavit that he saw Price rescue a correctional officer from serious injury or death after the officer was attacked by several other inmates. There is no affidavit from the officer who was attacked. Third, a former correctional officer swore by affidavit that another correctional officer told her Price had rescued the other officer from harm after being attacked by an inmate. This affidavit is rank hearsay, and there is no affidavit from the officer who was supposedly attacked. These three accounts—an unsigned addendum, an affidavit from an inmate, and a hearsay affidavit—convinced the State to request a sentence reduction. Perhaps the State investigated the accounts to verify they were true. While the truth of Price's alleged heroics is not before us, their suspect veracity is perhaps one reason for the State's regret over choosing to ask for a reduction.

The Solicitor and J. Todd Rutherford, Price's attorney, were in contact about a sentence reduction for Price as early as February 2022. Emails exchanged by the Solicitor and Mr. Rutherford's office establish that Mr. Rutherford prepared the first draft of a proposed sentence-reduction order and submitted the draft to the Solicitor on December 15, 2022. There was evidently communication between the two offices after December 15, because on December 28, Mr. Rutherford's law clerk forwarded another draft of a proposed order in the following email to the Solicitor and one of his deputies: "This draft should be void of any problem language contained in its original version. Could one of you double-check that we made the appropriate corrections?" The next day, December 29, the Solicitor sent an email to Mr. Rutherford's law clerk, asking her to "consult with Mr. Rutherford regarding the need for language in this proposed order that specifically references the assistance Mr. Price provided to law enforcement and the benefit [law enforcement] derived from it." In an email later that day, Mr. Rutherford's law clerk sent the Solicitor another draft, which included the addendum detailing Price's alert to SCDC that another inmate had escaped and been on the loose for three days.[16]

---

[16] The escaped inmate was Jimmy Causey. He escaped in July 2017 and was eventually apprehended in Texas. SCDC's Incarcerated Inmate Search reflects Causey is a two-time escapee, having first escaped in 2005. *Inmate Search Detail Report for Jimmy Causey*, S.C. Dep't of Corr., https://public.doc.state.sc.us/scdc-

The final email in the record is important. In that email—dated December 30—the Solicitor stated to Mr. Rutherford's law clerk, "Attached is the final revision that will be submitted to Judge Manning for his signature." Judge Manning signed the order that day. There is no letter or other communication in the record from the Solicitor to either Mr. Rutherford or Judge Manning requesting the order be held pending a filed motion, formal hearing, or notice to the victims. The order clearly states it was submitted "[u]pon motion of the Solicitor in accordance with S.C. Code Ann. § 17-25-65," and it reduced Price's sentence to the nineteen years he had already served.

When the State presented the final version of the sentence-reduction order to Judge Manning on December 30, the State knew at least six things: (1) in 2003, Price was convicted of murder and sentenced to thirty-five years in prison; (2) beginning in 1995, subsection 16-3-20 provided the mandatory minimum sentence for murder was thirty years and the maximum sentence was life without parole; (3) in the event of a "numerical" sentence, subsection 16-3-20(A) requires a murder defendant to serve the time day-for-day; (4) Mr. Smalls' parents and other family members deemed "victims" were entitled to notice of certain proceedings; (5) section 17-25-65 was enacted in 2010 and sets forth various procedures to be followed when a sentence reduction is contemplated; and (6) there is an interpretive tension between the mandatory minimum provision of subsection 16-3-20(A) and the subsequently enacted section 17-25-65.

The State requests this Court issue a writ of prohibition declaring the sentence-reduction order void, which I will address in section III. The majority evidently agrees such a writ does not lie to correct procedural irregularities in this case because the majority does not discuss that issue. The majority writes extensively about the history of this Court's authority to issue a common law writ of certiorari. That history is irrelevant, as we unanimously voted to issue a common law writ of certiorari to review the case. The mere issuance of the writ does not automatically afford relief to a party. To be sure, we have authority to issue a common law writ of certiorari to address the State's

public/ (search First Name field for "Jimmy" and Last Name field for "Causey," then click on "Causey, Jimmy").

contentions; however, the writ should be dismissed as improvidently granted if the facts and the law demand. This case is such a case.

## II. Attorney General's Authority

One reason the writ should be dismissed outright is that the Attorney General does not have authority to ask for or obtain relief in this case. The majority concludes "[t]his case validates the Attorney General's supervisory authority over the circuit solicitors pursuant to article V, section 24." The majority gives the Attorney General authority he does not have. Article V, section 24 provides, "The Attorney General shall be the chief prosecuting officer of the State with authority to supervise the prosecution of all criminal cases in courts of record." S.C. Const. art. V, § 24. A sentence-reduction proceeding is not a criminal prosecution. The criminal prosecution of Price ended in 2006 when his conviction was affirmed by this Court and a remittitur was returned, over sixteen years before the State initiated Price's sentence-reduction proceeding. Article V, section 24 does not extend the Attorney General's supervisory authority to "supervise" a sentence-reduction proceeding. But assume for the moment that article V, section 24 <u>does</u> extend the Attorney General's supervisory authority to sentence-reduction proceedings. Channeling the Attorney General's concession that "the State is the State is the State," it is patently improper for the Attorney General to obtain relief from a reduction order <u>the State</u>, by and through the Solicitor, sought and obtained.

Allowing the Attorney General to appear at this stage not only ignores the fact that a sentence-reduction proceeding is not a criminal prosecution, but it also diminishes the "strong measure of independence" enjoyed by elected solicitors. In *State ex rel. McLeod v. Snipes*, we said:

> We take judicial notice of the fact that there are now, in addition to the staff of the Attorney General, sixteen solicitors and as many or more assistant solicitors.

> Although the Attorney General is designated the chief prosecuting officer and has 'authority to supervise the prosecution of all criminal cases in courts of record', <u>the fact remains that the solicitors are elected in this State by the people and maintain a strong measure of independence</u>.

266 S.C. 415, 420, 223 S.E.2d 853, 855 (1976) (emphasis added). If we follow the majority's approach to its logical extreme, the Attorney General can "intervene"—the majority's characterization, not mine—in every sentence-reduction decision made by a solicitor. The Solicitor welcomes the Attorney General coming to his rescue in this case, but the precedent this case sets does violence to the strong measure of independence enjoyed by solicitors.

When it enacted section 17-25-65, the General Assembly surely considered the "strong measure of independence" enjoyed by solicitors. Indeed, section 17-25-65 explicitly requires the State to act through "the *circuit solicitor* in the county where the defendant's case arose." (emphasis added).

### III. State's Subject Matter Jurisdiction Argument

The State's primary argument is that the sentence-reduction order it procured is void for lack of subject matter jurisdiction. The majority correctly notes some of our caselaw misstates the concept of subject matter jurisdiction. To ensure completeness, I will briefly address the State's meritless subject matter jurisdiction argument.

"Subject matter jurisdiction is the power of a court to hear and determine cases of the general class to which the proceedings in question belong." *Pierce v. State*, 338 S.C. 139, 150, 526 S.E.2d 222, 227 (2000) (citing *Dove v. Gold Kist, Inc*, 314 S.C. 235, 442 S.E.2d 598 (1994)). Under section 17-25-65, the circuit court undoubtedly has subject matter jurisdiction to consider the reduction of a prison sentence when an inmate has rendered "substantial assistance" to the State. Subsection 17-25-65(C) sets forth procedural steps in the process. A motion for sentence reduction is to be made by the "circuit solicitor in the county where the defendant's case arose." S.C. Code Ann. § 17-25-65(C). The solicitor must "send a copy to the chief judge of the circuit within five days of filing." *Id.*

The motion may be heard by either the "chief judge" (presumably the chief administrative judge for general sessions in that circuit) or "a circuit court judge currently assigned to that county . . . ." *Id.* Judge Manning, the judge who considered the State's request and ultimately signed the sentence-reduction order, was a resident judge of the Fifth Judicial Circuit. His chambers were in the Richland County Judicial Center. According to the South

Carolina Judicial Branch website, Judge Manning's assignment from Monday, December 26 to Friday, December 30, 2022, was "In Chambers."[17]

The State contends two procedural defects in the circuit court proceedings deprived the circuit court of subject matter jurisdiction. The majority cites these deficiencies in holding the circuit court did not have "authority" to sign the order. I will discuss these deficiencies in detail in Part IV below, but none deprived the circuit court of subject matter jurisdiction.

The matter came before us on the State's petition for a writ of prohibition, about which this Court has observed:

> [I]t has been settled in this state from an early period that . . . if the inferior court or tribunal has jurisdiction of the person and subject-matter of the controversy, the writ [of prohibition] will not lie to correct errors and irregularities in procedure, or to prevent an erroneous decision.

*State v. Isaac*, 405 S.C. 177, 185 n.6, 747 S.E.2d 677, 681 n.6 (2013) (quoting *New S. Life Ins. Co. v. Lindsay*, 258 S.C. 198, 199-200, 187 S.E.2d 794, 796 (1972) (second alteration in original)).

As a resident circuit judge of the Fifth Judicial Circuit assigned to his Richland County chambers on December 30, 2022, Judge Manning had the power to hear and decide the question of whether Price would receive a sentence reduction. A writ of prohibition will not lie to correct the procedural irregularities in this case, nor will such a writ lie to prevent an erroneous result or, better put here, a result that saves the State from itself.

## IV. Procedural Defects

### A. The circuit court's purported "lack of authority"

---

[17] *Assignment of Judges to Terms of Circuit Court December 2022*, S.C. Jud. Branch, https://www.sccourts.org/calendar/dspCCJudgeAsgPrint.cfm (change month to "December," change year to "2022," choose "Go To Date, " and scroll to "Manning, L. Casey").

The majority concludes the circuit court lacked "authority" to consider a sentence reduction for Price because of certain procedural defects. I disagree.

Three procedural requirements recited by the majority are set forth in section 17-25-65 and have been addressed by the parties: (1) the circuit solicitor shall file a motion with the Clerk of Court in the county in which the defendant's case arose; (2) the circuit solicitor shall send a copy of the motion to the chief administrative judge of the circuit within five days of filing; and (3) the chief administrative judge or a judge "assigned to that county" has the authority "to hear and resolve the motion." S.C. Code Ann. § 17-25-65(C). The majority concludes the statute implicitly requires a hearing to be held in open court and that the hearing must be on the record.

The majority contends that a written motion, when filed with the clerk of court, "is available to any victims, the Attorney General, the press, and the public as notice" that a solicitor seeks a sentence reduction for an inmate. The majority also writes that the filing of a motion would give "any interested party[,]" including law enforcement, the opportunity to be heard. I first note that the mere filing of a motion does not put anyone on notice of anything. It is the service of a filing that places persons on notice of proceedings in general and of the specifics contained in the filing. Section 17-25-65 does not require any filing to be served on the Attorney General, law enforcement agencies, or the public. Certainly, the mere filing of a motion does not put the Attorney General on notice of a solicitor's request for sentence reduction. Because both the Attorney General and the solicitors are "the State," the Attorney General has notice of every proceeding in which a solicitor participates.

The State either caused or acquiesced in each procedural shortcoming in this case. We should not grant the State relief from the sentence-reduction order just because the State regrets the result it sought and obtained in the circuit court.

## B. Lack of a hearing and the sealing of the order

While I disagree with the majority's premise that a sentence-reduction proceeding is a "sentencing proceeding," I do not dispute the obvious. "Judicial proceedings and court records are presumptively open to the public under the common law, the First Amendment of the federal constitution, and the state constitution." *Ex parte Cap. U-Drive-It, Inc.*, 369 S.C. 1, 10, 630

S.E.2d 464, 469 (2006); *see* S.C. Const. art. I, § 9 ("All courts shall be public[.]"); *Davis v. Jennings*, 304 S.C. 502, 505-06, 405 S.E.2d 601, 603 (1991).

There is certainly unanimity in this Court that any court should exercise great care and discretion before closing proceedings or sealing any portion of a court record. Justice Burnett put it best when writing for the Court in *U-Drive-It*:

> Public access to courts and their records serves several fundamental interests which are crucial to the proper functioning of judicial and government systems. Public access discourages perjury and encourages bringing the truth to light because participants are less likely to testify falsely in a sunlit courtroom before their neighbors than in a private room before court officials. Public access promotes free discussion of governmental affairs by imparting a more complete understanding to the public of the judicial system and issues resolved by that system. Public access serves as a check on inappropriate or corrupt practices by exposing the judicial process to public scrutiny. Lawyers, witnesses, and judges may perform their duties in a more conscientious manner, knowing their conduct will be subject to public scrutiny either at the time of the proceeding or later through disclosure of court records.

369 S.C. at 10-11, 630 S.E.2d at 469-70.

I agree with Justice Burnett. However, a key question with respect to *U-Drive-It*, *Davis*, and other cases cited by the majority is what remedy is appropriate if the proceedings were wrongly closed or a portion of the record was improperly sealed? In such cases, the appropriate remedy is to vacate both the order closing the proceedings and the order sealing documents, not to undo the proceedings. In our April 20, 2023 order, we granted the appropriate remedy by directing the Richland County Clerk of Court to unseal the sentence-reduction order.

Obviously, there are due process considerations if a hearing is improperly closed to a party or if a party is improperly precluded from reviewing all or part of a court record. That is not the issue we have here. Here, over the course of ten months, the State communicated with Price's attorney about a sentence

reduction for Price.  The December 2022 emails prove at least three things about the two weeks leading up to the day the order was signed: the State and Price's attorney communicated about the specific content of the sentence-reduction order, the State prepared the final version of the order, and the State presented the order to the circuit court.  The majority concludes, in part, that the order must be vacated because, the proceedings were improperly closed to the public and the order was improperly sealed.

The cases cited by the majority support the majority's conclusion (with which I agree) that proceedings should not be improperly closed to the public.  However, those cases do not support the majority's decision to vacate the sentence-reduction order.

First, the majority cites *Ex parte Columbia Newspapers, Inc.*, 286 S.C. 116, 333 S.E.2d 337 (1985).  In that case, the family court issued an order closing the trial of two juveniles accused of murdering their mother.  We held that even though South Carolina Code section 20-7-755 (1976) validly contemplated closing a family court juvenile trial, the order closing the trial to the public violated article I, section 9 of the South Carolina Constitution.  We held that when a family court's decision to close a juvenile hearing is challenged by the public or the media, the family court must make specific findings that the closure of the hearing was necessary to protect the rights of the juveniles involved.  Crucially, in holding the family court did not make the appropriate findings, we did not vacate the entire proceedings before the family court.  We vacated only the order closing the trial.

The majority also cites *In re Greenville News*, 332 S.C. 394, 505 S.E.2d 340 (1998).  *Greenville News* stemmed from a death penalty case in which the circuit court issued an order closing a pretrial suppression hearing.  The Greenville News challenged the order, claiming it violated the rule against closure of pretrial hearings.  This Court agreed.  The remedy granted by this Court?  Vacating the circuit court's order closing the hearing, not vacating the order ruling on the merits of the suppression issues.  *Id.* at 397, 505 S.E.2d at 342.

The majority also cites *Ex parte Hearst-Argyle Television, Inc.*, 369 S.C. 69, 631 S.E.2d 86 (2006).  In *Hearst-Argyle Television*, the circuit court conducted a suppression hearing in a death penalty case after ordering the hearing closed

to the media.  The hearing moved forward without media present.  Two media outlets appealed.  We agreed with the media outlets that the proceedings were improperly closed.  However, the remedy again imposed by this Court was to vacate the closure order, not to vacate the rulings made by the circuit court in the suppression hearing.  *Id.* at 77, 631 S.E.2d at 90.

The majority also cites *In re Washington Post Co.*, 807 F.2d 383 (4th Cir. 1986), and *In re Hearst Newspapers, L.L.C.*, 641 F.3d 168 (5th Cir. 2011).  In *Washington Post*, the trial court closed a plea hearing and sentencing hearing in an espionage case.  807 F.2d at 385.  Noting the plea and sentencing hearings had already been conducted, the Fourth Circuit determined the proper remedy was to "simply vacate the orders" closing the hearings.  *Id*. at 393.  The Fourth Circuit did not vacate the results of the hearings.  In *Hearst Newspapers*, the district court issued an order closing the sentencing proceeding of a drug cartel leader.  A reporter employed by Hearst Newspapers attempted to enter the courtroom but was not allowed in.  The district court, aware Hearst Newspapers was finalizing a motion to be allowed in the courtroom, proceeded with the sentencing hearing in a closed courtroom.  After the hearing, the district court denied as moot Hearst Newspapers' motion to open the proceedings to the public.  Hearst Newspapers appealed.  The Fifth Circuit did not determine whether the closure order "was substantively wrong," but it held the district court did not follow proper procedures in closing the proceeding. 641 F.3d at 187.  Noting the sentencing proceeding had already occurred, the Fifth Circuit vacated the order closing the proceeding but did not vacate the sentencing order.  *See id.* at 186-87.

The cases cited by the majority involve non-party media entities that were improperly excluded from proceedings.  Here, the State was a party to the sentence-reduction proceeding.  As one Justice aptly observed during oral argument in this case, "The publicly-elected Solicitor drove this [case] into the dark."  I repeat the common thread in this dissent.  By vacating the sentence-reduction order, the majority rescues the State from a problem the State created.  We should not vacate the sentence-reduction order.  The proper remedy is to (1) vacate the circuit court's decision not to hold a public hearing and (2) vacate the order sealing the sentence-reduction order.  We have already unanimously voted to do both.

### C. Victims' Bill of Rights and Victims' Rights Act

I agree with the majority's conclusions on this point. It is difficult to dispose of this issue so summarily, as Price's release from custody undoubtedly reopened many wounds and sufferings of the victim's family. The State should have notified the family of the State's request that the circuit court reduce Price's sentence; however, the State's failure to do so, while an extreme oversight, is not a ground for vacating the sentence-reduction order.

## D. Does subsection 16-3-20(A) restrict the circuit court's authority to reduce Price's sentence under section 17-25-65?

The majority does not reach this issue, as it concludes its analyses of the previously discussed issues are dispositive. Because I disagree with the majority on those issues, I will address the interplay between subsection 16-3-20(A) and section 17-25-65.

Enacted in 2010, section 17-25-65 allows the circuit court to reduce a defendant's sentence when the defendant provides certain substantial assistance to the State. The State argues subsection 16-3-20(A) prohibits the reduction of a murder sentence. I disagree with the State.

Since 1995, subsection 16-3-20(A) has set a thirty-year mandatory minimum sentence for murder. The State suggests a sentence reduction under section 17-25-65 is a prohibited "early release program" or "credit." These two terms are noted in the following language from subsection 16-3-20(A):

> No person sentenced to a mandatory minimum term of imprisonment for thirty years to life pursuant to this section is eligible for parole or any early release program, nor is the person eligible to receive any work credits, education credits, good conduct credits, or any other credits that would reduce the mandatory minimum term of imprisonment for thirty years to life required by this section.[18]

The reduction of a sentence contemplated in section 17-25-65 is not an "early release program" as contemplated in section 24-13-150. The word "program"

---

[18] The 1995 amendment added the words "to life" in the last sentence of this portion of subsection 16-3-20(A). The addition of those two words is irrelevant to the question before us.

contemplates a structured system involving supervision of a released prisoner and monitoring his compliance with the program. Indeed, the General Assembly has created several true early release programs, all of which require supervision of the released prisoner by the South Carolina Department of Probation, Parole, and Pardon Services. *See, e.g.*, S.C. Code Ann. § 24-21-560 (2007 & Supp. 2022) (community supervision); S.C. Code Ann. § 24-21-610 to -715 (2007 & Supp. 2022) (parole); S.C. Code Ann. § 24-13-710 to -720 (2007 & Supp. 2022) (supervised furlough); S.C. Code Ann. § 24-13-1310 to -1330 (2007 & Supp. 2022) (shock incarceration). Nor does Price's release fall within the scope of a work, good time, education, or other credit. Those credits are set forth in South Carolina Code sections 24-13-210 through -230 (2007 & Supp. 2022), and they involve SCDC calculating the credits to which an inmate is entitled. Section 17-25-65 does not.

When the General Assembly enacted section 17-25-65 in 2010, it was presumed to have knowledge of the thirty-year mandatory minimum sentence that had been in effect for fifteen years. "A basic presumption exists that the legislature has knowledge of previous legislation when later statutes are passed on a related subject." *Berkebile v. Outen*, 311 S.C. 50, 53, 426 S.E.2d 760, 762 (1993). Section 17-25-65 identifies the specific instances in which a court may reduce a defendant's prison sentence, and there is no exception for prisoners convicted of murder. The General Assembly could have easily inserted an exception for murder when it enacted section 17-25-65 in 2010. It did not do so.

## V.

The majority references "Solicitor Gipson's plan to keep the public from knowing that Gipson agreed to have this convicted murderer released early." The majority concludes "[t]he plan worked" until the press got wind of Price's release, until this Court ordered the unsealing of the sentence-reduction order, and "until the Attorney General stepped in to demand the law be followed." The majority suggests Solicitor Gipson executed—with Judge Manning's help—a secret plan to have Price released early. Even if Solicitor Gipson did have a secret plan, Solicitor Gipson and the Attorney General play for the same team. Thus, Solicitor Gipson's secret plan was the Attorney General's secret plan. This Court should not relieve the State from its obviously poor choice to concoct a secret plan to seek a reduction for Price.

Finally, the majority contends its decision to vacate the sentence-reduction order "find[s] ample support in our prior decisions," but it cites only one decision, *State ex rel. McLeod v. County Court of Richland County*, 261 S.C. 478, 481-85, 200 S.E.2d 843, 844-46 (1973). The majority accurately summarizes the basic facts of *McLeod*, so I will not rehash them here. While I do not think *McLeod* is on all fours with this case, I note that in *McLeod*, we relied upon our statement of the general rule in *State v. Best*:

> When a trial judge adjourns his court [s]ine die, he loses jurisdiction of a case finally determined during that term, *except under special circumstances, as where either by consent or acquiescence of counsel for both sides*, or postponing determination of motions duly entered during the sitting of the court, or in some cases where supplemental orders germane to and carrying out the order duly made, and not inconsistent therewith, may be passed.

257 S.C. 361, 369–70, 186 S.E.2d 272, 276 (1972) (emphasis added) (quoting *Shillito v. City of Spartanburg*, 215 S.C. 83, 88, 54 S.E.2d 521, 522 (1949)). To the extent *McLeod* does apply in this case, common sense dictates that the State cannot complain about relief granted by a judge when, as here, the State sought and obtained that very relief. There is no question the State consented to and acquiesced in every step of Price's sentence-reduction proceeding. We should not grant the State relief under these circumstances.

## VI. Conclusion

The Attorney General's authority over circuit solicitors extends only to the supervision of criminal prosecutions. Price's prosecution ended in 2006, and the Attorney General's supervisory authority ended with it. Even if the Attorney General has authority to appear in this case, the law simply does not allow this Court to rescue the State from its own failures. Various procedural deficiencies, the lack of a hearing, and the circuit court's improper sealing of the order do not render the order a nullity.

The majority contends "it is the constitutional and statutory duty of this Court to act." I respectfully disagree. The Court's constitutional and statutory duty in this case is to exercise restraint and resist the temptation to relieve the State from the consequences of its own actions.

**BEATTY, C.J., concurs.**